NORANDA ALUMINUM, INC., a corporation, Respondent,

v.

MISSOURI DEPARTMENT OF REVE-
NUE, an agency of the State of
Missouri, Appellant.

No. 61218.

Supreme Court of Missouri,
Division No. 2.

May 13, 1980.

John Ashcroft, Atty. Gen., Arnold Day,
Asst. Atty. Gen., Jefferson City, for appel-
lant.

Clifton A. Lake, Rooks, Pitts, Fullagar &
Poust, Chicago, Ill., for respondent.

ALDEN A. STOCKARD, Commissioner.

■ The Department of Revenue of the
State of Missouri assessed Noranda Alumi-
num, Inc. (hereafter referred to as "Noran-
da") $115,456.85 tax and interest, which was
paid under protest, for failure to file what
the Department considered to be correct
sales/use tax returns and pay the tax for
the period beginning January 1, 1974
through October 1, 1975. After an adminis-
trative hearing the Director of Revenue
issued a final decision in which he granted
Noranda's protest to some of the disputed
items but denied it as to the remainder.
Noranda appealed to the Circuit Court
which reversed the order affirming the fi-
nal assessment, and the Director of Reve-

nue has appealed to this court which has exclusive original appellate jurisdiction because a construction of the revenue laws of this State is involved. Mo.Const. Art. V, § 3.

Noranda operates a large complex in New Madrid, Missouri for the production of aluminum metal and aluminum products. During the tax period referred to above, in order to increase productive capacity Noranda made a substantial expansion of facilities which included the addition of what is referred to as "pot-room cranes," the construction of a new bake-room, and the acquisition of new and improved laboratory equipment. In doing so it purchased certain machinery and equipment at a cost in excess of $3,000,000.00 for which it claimed an exemption from sales and use tax on the grounds that such machinery and equipment was used directly in the production of aluminum.

Noranda produces aluminum by an electrolytic process that reduces aluminum oxide to its constituent elements of aluminum and oxygen. The actual production occurs in what is called a pot line located in two buildings, each of which contains 87 pots or reduction cells. Small hoppers containing aluminum oxide located immediately above each pot periodically release their contents into each pot. An electrical conductor, known as a "bus," located in front of each pot, conducts an electric current to the pots, and a busguard made of angle iron covers the bus in order to protect the electrical equipment from damage through spillage of molten aluminum.

An electrical current is conducted through each pot between a cathode located in the pot and a carbon anode assembly which is suspended over and into the pot. Each carbon anode assembly consists of two, 800-pound carbon anode blocks which have a life span of only about eighteen days.

During the production of aluminum, technicians obtain a portion of molten aluminum from each pot which is poured into a mold to form a small disc or "button" of aluminum. These are then transmitted by a pneumatic tube to a nearby laboratory building for testing. The equipment used to test the samples consists of a computerized spectrochemical system, and the purpose is to ensure satisfactory performance of the production process and to identify each constituent element of the aluminum oxide. During the tax period in question, Noranda acquired new and greatly improved laboratory equipment. The computerized spectrochemical system replaced older laboratory equipment and is capable of handling double the amount handled by the replaced equipment and is superior in technical accuracy.

As noted, the anodes used in the production of molten aluminum have a relatively short period of usefulness. Noranda operates facilities to produce the necessary anodes which consist of petroleum pitch and calcine petroleum and require a baking process. Noranda has two buildings in which the baking process occurs, one of which is new. Within the new building are two furnace lines bisected by a roller conveyor. The "green" anodes are received from the production process and moved into the furnace by use of a central roller conveyer which has an eight-ton stacker at one end and a nine-ton stacker at the other. Each of two furnace lines in the new bake-room building consists of eighteen furnace sections with six individual underground furnaces per section. The furnaces are constructed primarily of concrete, and are lined with refractory brick and mortar. Natural gas or propane heat is introduced into the furnace to bake the anodes at 900 degrees centigrade. The refractory brick lining must be constantly monitored and repaired. There is what is referred to as the bake-room crane which is positioned above the two furnace lines on horizontal rails running the entire length of the lines. The crane is used to move the green anodes from the roller conveyor into the furnace, and to cover each anode with a blanket of calcine petroleum. It also is used to remove the baked anodes from the furnaces, and for other work necessary in the production of anodes and the maintenance of the

equipment. After baking, the anodes are taken to what is called the "rodding section." There, two anodes are connected by a steel yoke or rod to form the carbon anode assembly, and they are coated with molten aluminum to prevent rapid burning.

The material and equipment for which Noranda claimed exemption, all of which are located in the new pot-room building, the new bake-room building, or the old laboratory building, include the following:

(a) refractory brick and mortar used in the carbon anode baking furnace,

(b) the baking room crane used to move unbaked and baked carbon anodes in the baking furnaces,

(c) four carbon anode change cranes used in the pot-rooms to remove and replace anodes in the reduction cells,

(d) two pot-room cranes used to transport hoppers containing aluminum from the storage facility to each reduction cell and in the periodic tapping of molten aluminum metal from the reduction cells,

(e) the carbon anode conveyor system used in the baking room to convey and stock anodes prior to and after the baking process,

(f) walkways and stairs located on the upper structure of each reduction cell to enable employees to perform duties in connection with the removal and replacement of spent carbon anodes,

(g) bus-guards designed to prevent spillage of molten aluminum onto portions of the electrical system of each reduction cell,

(h) laboratory equipment designed for chemical and physical analysis of aluminum metal and to monitor the efficiency of the reduction process.

In his final decision the Director of Revenue sustained the protest of Noranda as to the items designated above as (c), (d), and (f). Therefore, the only items as to which a sales or use tax exemption is in dispute on this appeal are the remaining five.

Section 144.030.3 RSMo 1969 provided a specific exemption from the provisions imposing a sales or use tax, among other things, of the following:

"(4) Machinery and equipment purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption; * * *." [1]

In the final decision of the Director of Revenue it is stated that the "only issue upon which [that] decision [was] rendered" was whether any or all of the contested items are exempt by reason of § 144.030.-3(4), and on this appeal it is contended that the trial court erred because (a) the disputed equipment is not "used directly in the manufacturing of aluminum and related products," and (b) the "refractory brick, mortar, bake-room cranes and anode conveyor system were purchased and used for the fabrication of products (anodes) which are in turn utilized in the manufacture of aluminum and therefore are not machinery and equipment used directly in manufacturing a product which is intended to be sold for final use and consumption." In this way the Director of Revenue has limited the issue on this appeal to whether the disputed equipment is "used directly" in the manufacture of aluminum as that term was used in § 144.030(4) prior to its amendment.

In the recent case of *Floyd Charcoal Company, Inc. v. Director of Revenue* (Mo.1980) 599 S.W.2d 173 (Mo.1980), this court considered for the first time the meaning of the language in § 144.030, RSMo 1969, providing an exemption from the sales or use tax when machinery or equipment is purchased to be "used directly in manufacturing * * * a product." In that opinion previous cases in this jurisdiction which had a bearing on the issue were

---

1. An amendment to § 144.030 made in 1977 inserted after the words "Machinery and equipment," the language "and the materials and supplies solely required for the installation or construction of such machinery and equipment," and also inserted the words "and equipment" after the words "such machinery." Laws of Mo.1977, P. 328.

considered, as well as those cases from other jurisdictions. It was there pointed out that the Department of Revenue followed a rule of strict construction, referred to as the Ohio-Georgia rule, which "limits the exemption to machinery and equipment which perform a function involving a change of the raw material involved into the finished product and excludes machinery and equipment used in preparation for manufacturing or after completion of the manufacturing process." In the *Floyd Charcoal* case the taxpayer, as does Noranda in this case, supported what is known as the "integrated plant" theory of construction of the exemption provisions. We shall not here set forth in detail the reasoning of the opinion in the *Floyd Charcoal* case; it is sufficient to say that the result, with which we agree, is that the "integrated plant" approach is "consistent with the * * * legislative intent behind the exemption." As there pointed out, "Modern manufacturing facilities are designed to operate on an integrated basis," and "to limit the exemption to those items of machinery or equipment which produce a change in the composition of the raw materials involved in the manufacturing process would ignore the essential contribution of the devices required for such operation."

■ When we apply the construction of the exemption provision which was approved and adopted in the *Floyd Charcoal* case, it is clear that the items designated and set forth above as (a), (b), (e), and (g) are used in steps or operations that are essential to and comprise an integral part of Noranda's manufacturing process, and are "used directly for manufacturing or fabricating a product" as that term was used in § 144.030 RSMo 1969. As to these items the judgment of the circuit court is correct and should be affirmed.

The laboratory equipment does not present as clear a case, and it is necessary to examine in greater detail the evidence concerning the use of the equipment in the laboratory.

Each day technicians take samples of the molten aluminum from each pot and periodically from each crucible which are sent to the laboratory which is in close proximity. The samples are immediately analyzed by the spectorchemical system. The results of the tests of the samples taken from the pots are then used to monitor the production process and determine whether it is functioning properly and to determine if there are impurities getting into the aluminum. These tests are run while the process of reducing aluminum oxide to its constituent elements of aluminum and oxygen is being carried on. The tests of the samples taken from the crucibles are used to direct the molten aluminum into further fabricating. Noranda's products consist of more than blocks of aluminum. As stated by Noranda's spokesman at the hearing, the "fabricating facilities * * * consist of a cast house where * * * molten aluminum is poured into molds of similar types to produce [the] final product, and it also consists of a rod, wire and cable mill where molten aluminum is made into a three-eighths inch rod which is then drawn down into wire and made into electrical wire or conductors." He then stated that "With the variety and end uses to which our product can be made, there is a need for various alloys, various [variations?] of the so-called impurities, and the lab results are used to direct the crucibles into the most finishable fabrication given the products that they can have."

It thus is clear that the items purchased and used in the laboratory are essential to and a part of the manufacturing process of the aluminum, and the aluminum products, and also are essential to and a part of the manufacturing and fabrication of the aluminum into the final products. Therefore, the items constitute machinery and equipment used directly in manufacturing or fabricating a product intended to be sold for final use or consumption. As to item (h) the judgment of the trial court is correct and should be affirmed.

The judgment of the trial court was that the Department of Revenue refund to Noranda the amount of sales and use tax paid under protest "plus interest at the statutory rate from the date of Noranda's payment of such amount under protest, less any sum

which may have previously been refunded * * *."

■ The Director of Revenue admits that § 144.685 V.A.M.S. provides for the payment of interest at six percent per annum on refunds of use tax found to have been erroneously collected, but he asserts that there is no statutory authority for the payment of interest on a refund of sales tax paid under protest and later determined to have been erroneously collected, and in his second point he asserts that the trial court erred in ordering the payment of interest on the refund of sales tax.

Section 144.700 RSMo 1969 provided that "All revenue received by the director of revenue from the tax imposed by sections 144.010 to 144.430 * * * [the sales tax act] shall be promptly deposited in the state treasury to the credit of the general revenue fund, except that, if any payment of the tax is made under protest, the director of revenue shall hold the amount in a special deposit until the liability of the taxpayer therefor is finally determined."[2] The Director of Revenue admits that the sales tax paid by Noranda under protest has been held by him in a "special deposit."

In *International Business Machines Corp. v. State Tax Commission*, 362 S.W.2d 635 (Mo.1962), it was held that in the absence of a provision in the sales tax act for the payment of interest on refunds, none can be made. The court did not address the question of interest earned on money held by the Director of Revenue on "special deposit." However, in *Southwestern Bell Telephone Co. v. Feuerstein*, 529 S.W.2d 371 (Mo.1975), a case pertaining to the refund of property taxes, it was held that refunds should be made "together with the earned income on such amounts * * *." After pointing out that the applicable statute required the collector to impound in a separate fund all taxes paid under protest until the taxpayer's action to recover the payments be determined, it was held: "If the funds are so deposited, and are subsequently ordered refunded to the taxpayer, it is reasonable that the taxpayer be entitled to

the earnings therefrom. Otherwise, the state would receive a benefit from the erroneous or illegal collection of the taxpayer's money." It was further held that the provision in § 139.031(5) that "No taxpayer shall receive any interest on any money paid in by him either erroneously or under protest," indicated an intention on the part of the legislature "that no *state* funds from the treasury be used to make interest payments on impounded taxes paid in by the protesting taxpayer, and thus if the impounded funds are not placed in an interest bearing account, the taxpayer would not be entitled to any interest thereon."

In *Canteen Corporation v. Goldberg*, 592 S.W.2d 754, 757 (Mo. banc 1980), this court determined that the taxpayer was entitled to the refund of sales tax paid under protest and placed by the Director of Revenue in a "special deposit" as required by § 144.-700, but then said: "We decline to expand the *Feuerstein* holding to the Sales Tax Law. On the record before us, we cannot anticipate the practical effect of such a holding."

We agree that in the absence of a statute specifically authorizing the payment of interest, no funds from the state treasury may be used to pay interest. But § 144.700 provides that the sales tax paid by Noranda under protest was not to be deposited in the state treasury, but instead was to be held in a "special deposit." In effect, the Director of Revenue was to hold the tax paid under protest as trustee for whomever, that is, the State or the taxpayer, was subsequently determined to be entitled to it. If the state prevails, there can be no question that it is entitled to the earnings or increase, if any, of the principal fund. If the taxpayer prevails, there should, in our opinion, be no question that he is entitled to the earnings or increase to his money while held over his protest by the trustee of that fund. We agree with the statement in *Hawaiian Land Co. Ltd. v. Kamaka*, 56 Hawaii 655, 547 P.2d 581, 585 (1976), that " * * * when the tax is paid under protest and the protesting

---

**2.** This section was amended in 1978 in respects not here material. See § 144.700 RSMo 1978.

taxpayer prevails, the principal sum of the tax paid under protest [and held in a "special deposit"] and the earnings thereon remain throughout as the property of the taxpayer. Thus, any, action instituted by the taxpayer seeking recovery of the earnings or increase of the principal sum, will not be an action requiring the State to pay interest on the tax paid under protest."

We see no problem in the practical effect of this holding. If the Director did not invest the funds held in the "special deposit," or for some other reason there was no income, the taxpayer is entitled only to the amount of the taxes paid under protest. The amount of income, if any, from the investment of the fund is a question of fact. If the taxpayer's money did accumulate earnings while in the possession of the Director of Revenue, the amount is or should be readily ascertainable from the records, and it is contrary to fairness and justice that the State should benefit from its wrongful assessment of the tax.

This leaves only the question of whether Noranda is entitled to the income equal to the "statutory rate" of interest, if it produced that amount, as the trial court adjudged, or to all income. Noranda has not appealed or placed in issue this order as to the amount. The judgment must be amended to provide that the interest to be paid is limited to the amount earned, if any, but not more than six percent.

The judgment of the trial court that the Director of Revenue refund the sales tax paid under protest "plus interest at the statutory rate" is reversed and the case is remanded to determine the earned interest on the fund comprising the sales tax paid under protest, and to award Noranda the actual interest income not to exceed six percent per annum. The judgment is otherwise affirmed.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the court.

All of the Judges concur.