CONCORD PUBLISHING HOUSE, INC. f/k/a/ Cape Mississippi Development, Inc., d/b/a Southeast Missourian, Respondent,

v.

DIRECTOR OF REVENUE, STATE OF MISSOURI, Appellant.

No. 77894.

Supreme Court of Missouri, En Banc.

Feb. 20, 1996.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gretchen Garrison, Asst. Atty. Gen., Jefferson City, for appellant.

Lawrence Weltman, Richard Ahrens, St. Louis, for respondent.

William Jay Powell, Columbia, for amici curiae, Missouri Press Association, et al.

PRICE, Judge.

The Director of Revenue appeals the Administrative Hearing Commission ("AHC") decision exempting Concord Publishing Company ("Concord") and Cape Mississippi Development, Inc. ("Cape") from sales and use tax on computers and computer equipment the companies purchased and used to implement changes in the production process and format of the newspaper and to increase the number of newspapers sold. We affirm in part and reverse in part.

I.

Cape and Concord have been under common ownership since 1986. Before 1992, Concord's primary business was commercial printing. One division of Concord operated a printing press which was used to print a number of newspapers, including the Southeast Missourian ("SEMO"). Cape owned and published SEMO. Cape became the owner of the press division sometime in 1990. On July 31, 1992, Cape formally merged into Concord.

Before and during the audit periods Cape used a "tiling", or overlaying process to prepare SEMO for print. Text was entered into computers and printed off on laser printers. It was then manually arranged on a sample page, and a photograph was taken to create a negative. Color photographs were processed manually by aligning separate negatives of the photo for each of the four basic colors. The negatives were sent to Concord's press which used them to print the newspapers Cape sold to the public. Cape entered the

cost of the printing as an expense on its books and Concord entered the cost as revenue.

SEMO is now published using the "pagination" process which eliminates much of the manual work involved in creating a layout. Newspaper pages are assembled on a computer network and the negative is electronically produced. Photographs are aligned by computer as well, resulting in sharper images at a lower cost. More color pictures are now used by SEMO and there is a new masthead. Because of pagination, SEMO is assembled more quickly, extending the deadlines for reporters and including more current news. SEMO is now published seven days a week instead of six.

In 1993 the Director audited Concord for the period September 1, 1989 through August 31, 1992, and Cape for the period September 16, 1989 through April 28, 1992. During the audit periods both companies purchased computer equipment that is now used in pagination. The equipment was not purchased to replace old, worn out, or obsolete equipment but to upgrade the publication system in order to implement pagination and expand production.

Because of the significant capital expense involved, the necessary equipment for pagination was purchased over time as finances would allow. A requirement for each item purchased was the capability of working with all other present and future components in the pagination system. Pagination was not implemented until October, 1993. Until then, some of the equipment was used on an interim basis in the tiling process. The Director assessed sales and use tax on the equipment, which Cape and Concord paid under protest.[1]

■ This Court has jurisdiction pursuant to Mo. Const. art. V, § 3 and reviews the AHC's interpretation of revenue law de novo. *L & R Egg Co. v. Director of Revenue*, 796 S.W.2d 624, 625 (Mo.banc 1990). Factual determinations are upheld if supported by "substantial evidence upon the whole record." *Id.;* § 621.193, RSMo 1994[2]. *In accordance with this standard we essentially adopt the factual findings of the AHC.*[3]

## II.

■ This case involves the assessment of sales and use taxes for items purchased or used in Missouri. *§ 144.020; § 144.610.* Apparently Concord and Cape issued exemption certificates to the sellers of the equipment and are therefore the proper parties to this action. *Conagra Poultry Co. v. Director of Revenue*, 862 S.W.2d 915, 918 (Mo. banc 1993); *§ 144.210.1.*

Cape and Concord, now merged as Concord, argue that the computer equipment

---

1. Cape paid $9,417.67 and Concord paid $12,389.60.

2. All statutory references are to the 1994 Missouri Revised Statutes unless otherwise indicated.

3. The AHC exempted the following items from sales and use taxes:
   Concord purchased for the publication of SEMO:
   1. Powerbook, laptop computer (12/91)
   2. Daisy CD Rom (6/92)
   3. Syncmaster, monitor (6/92)
   Cape purchased for the publication of SEMO:
   1. Equity, VGA Bund, ARC crd, computer (4/90)
   2. Macintosh II FX, SCSI, and keyboard, computer (5/90)
   3. Macintosh SE computer, keyboard, and PAR, computer (5/90)
   4. Memory Simm, memory expansion (12/90)
   5. Logic Board and Macintosh II FX, computer (3/91)
   6. Travelmate, laptop computer (3/91)
   7. Maxtor, disk drive (3/91)
   8. Power Flex notebook, Multisync, laptop computer and color monitor (3/91)
   9. Notebook, laptop computer (3/91)
   10. Power Flex, Multisync, PM9, M26, computers (3/91)
   11. Computer (4/91)
   12. Power Flex notebook, laptop computer (6/91)
   13. Five Arcnet memory boards (6/91)
   14. Phonet Connectors, connects computers (5/90)
   * The Director conceded that a Lasco corner rounder was exempt and the taxpayers conceded assessment to a 330 MB SCSI, which the AHC recognized were no longer in issue but were listed in the AHC's statement of facts.
   We adopt the findings listed above except for one Power Flex computer (item 8), purchased in March of 1991 by Cape, which the record shows was purchased for use by a sister corporation and not for the SEMO's publication. We also find that Concord used an Apple DTB Mouse, purchased in June, 1992 in an exempt manner.

should be exempt from sales tax under § 144.030.2(4) and (5). These exemptions also apply to use taxes. *§ 144.615(3).* We find the purchases are governed by § 144.030.2(4) and (5) which exempt the following:

(4) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, replacing and used for the same purposes as the machinery and equipment replaced by reason of design or product changes, which is purchased for and used directly for manufacturing or fabricating a product which is intended to be sold ultimately for final use or consumption;[4]

(5) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption;

■ Neither sales nor use tax is due on machinery and equipment (1) used directly (2) in manufacturing (3) a product which is intended to be sold ultimately for final use or consumption (4) if the machinery or equipment was purchased (a) to replace existing equipment by reason of design or product changes or (b) to expand existing manufacturing. These statutes were enacted by the legislature to encourage the production of items ultimately subject to sales tax and to encourage the location and expansion of industry in Missouri. *Bridge Data Co. v. Director of Revenue,* 794 S.W.2d 204, 206 (Mo. banc 1990); *State ex rel. Ozark Lead Co. v. Goldberg,* 610 S.W.2d 954, 957 (Mo.1981); *Floyd Charcoal Co. v. Director of Revenue,* 599 S.W.2d 173, 177 (Mo.1980); *Heidelberg Central, Inc. v. Director of Dept. of Revenue,*

476 S.W.2d 502, 506 (Mo.1972); *West Lake Quarry & Material Co. v. Schaffner,* 451 S.W.2d 140, 142 (Mo.1970).

The Director does not contest that the listed items are machinery and equipment. Nor does she dispute that the newspaper is a product intended to be sold for final use or consumption and on which sales tax is properly collected. The Director, however, claims that the computers purchased and used in the publication of SEMO (1) were not used in manufacturing the newspaper, (2) the computers were not used in "directly" manufacturing the newspaper, (3) the changes in the post-pagination SEMO were not a "product change", (4) even if there was a "product change", the change did not occur until after the audit period, (5) increased production volume is not expanded manufacturing, (6) the taxpayers provided insufficient proof of the exemption, and (7) Concord could not claim the exemption for the equipment it purchased but Cape used in an exempt manner.

### III. Used Directly in Manufacturing

#### (A) Manufacturing

■ The Director claims that the computer equipment was not used directly in manufacturing SEMO. Although she concedes that printing presses, or presumably other equipment that involve the printing of words and pictures on the actual paper sold, are used in manufacturing a newspaper, she claims that gathering, storing, and arranging the information printed is not manufacturing. We disagree.

Newspaper publication involves the mechanical processing of words and pictures. It begins when words are put into the network. Manufacturing occurs as those words are manipulated and finally affixed onto a printed page, creating a new edition "through the use of machinery, labor and skill." *Heidelberg Central,* 476 S.W.2d at 506.[5]

---

4. In 1995, § 144.030.2(4) was amended to include exemptions for machinery and equipment purchased and used to establish new or to expand "material recovery processing plants." *§ 144.030.2(4), RSMo Supp.1995.* This amend-

ment does not affect the exemption as it applies to this case.

5. In *Heidelberg* it was noted that cases from other jurisdictions have held that the publication

We have already established that organizing information through computer technology is "manufacturing." *Bridge Data Co.,* 794 S.W.2d at 206. In *Bridge Data,* we held that the hardware in the taxpayer's computer system, used to collect raw financial data and transmit the data to customers, qualified for an exemption even though the final product was intangible. We concluded that "what comes out of the system is clearly different from what went into it"; therefore, the computers were involved in "manufacturing." *Id.*

▮ We find the present case indistinguishable from *Bridge Data.* The computer layout system here is also used to process data and convey information to customers. The final product is clearly different from what is put into the system. The present case is even stronger because the computer network produces a tangible, taxable product, a newspaper.[6]

The Director's argument that the only manufacturing that occurs in the publishing of a newspaper is the process of putting ink on paper is artificially limited. It ignores the labor, skill, and complex machinery required to generate daily newspapers and the transformation that took place when the taxpayers adopted the pagination system. We hold that the computers in the present case were used in "manufacturing" a newspaper.[7]

### (B) Directly Used

▮ The Director claims that even if the pagination system is considered manufacturing, it does not *directly* manufacture the newspaper, which is the item intended to be "sold ultimately for final use or consumption." The Director makes four arguments. First, she claims the computer equipment is used merely to produce a negative which is not sold and has no retail value. Second, she claims that the "integrated plant doctrine" does not apply between separate corporate entities. Third, the Director argues that because the newspaper is produced in two different locations it cannot be considered a single integrated process. Finally, she claims that laptop computers used by reporters are not integrally used in the pagination process. Consistent with our holding above, we disagree with the Director on all four points.

### (i)

The Director claims that the computers directly produce a negative, not a newspaper, and because the negative is not the final product Cape and Concord do not qualify for either exemption. Although some courts strictly interpret the phrase "directly used" to exempt only those machines that physically alter raw materials to a finished product, Missouri has adopted the "integrated plant doctrine", viewing manufacturing operations as "continuous and indivisible." *Floyd,* 599 S.W.2d at 178 (citing *Niagara Mohawk Power Corp. v. Wanamaker,* 286 A.D. 446, 144 N.Y.S.2d 458, 462 (N.Y.Sup.Ct.1955)); *Noranda Aluminum, Inc. v. Missouri Dept. of Revenue,* 599 S.W.2d 1, 4 (Mo.1980). In *Floyd* we rejected a contention similar to

and circulation of a newspaper is not "manufacturing." *Heidelberg,* 476 S.W.2d at 505. However, this Court has recently construed "manufacturing" more liberally. *See Bridge Data,* 794 S.W.2d 204; *Jackson Excavating Co. v. Admin. Hearing Comm'n,* 646 S.W.2d 48 (Mo.1983); 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation* § 14.05[2][d] (1992).

6. Interestingly, the Department of Revenue's own regulations state that "[n]ewspaper publishers are manufacturers of tangible personal property" and that machinery and equipment purchased by publishers may qualify for the exemptions under § 144.030.2(4) and (5). *12 CSR 10–3.872(6).* The regulation does not limit manufacturing to printing presses only and must be construed to include the full process of producing a newspaper.

Notably, the Department of Revenue requires printing businesses to collect sales tax on publications, catalogues, leaflets, etc. they print, but does not allow a deduction for preparing copy or artwork that may be included in the final charge. *12 CSR 10–3.348.* If the department includes design charges in calculating sales tax as if it were the sale of manufactured, tangible property and not a service, then companies should be allowed to claim manufacturing exemptions on the equipment used in designing or formatting the printed material.

7. This holding is limited to the computers used in producing the newspaper. We have not considered whether computer equipment used for administrative duties or ordinary office work are used in manufacturing a product.

that made by the Director in this case. "To limit the exemption to those items of machinery or equipment which produce a change in the composition of the raw materials involved in the manufacturing process would ignore the essential contribution of the devices required for such operation." *Floyd,* 599 S.W.2d at 178.

By holding the computers are used in manufacturing a newspaper, we also find they are directly used in manufacturing because they are an integral part of the publication process. The computers are as essential to the printing of the paper as the printing presses themselves. A more limited view of the process would arguably exclude the most important step in manufacturing a newspaper, the composition and editing of its contents.

(ii)

■ The Director also argues that the integrated plant doctrine connects machinery, not corporations. She maintains that for the period of time when Cape and the press division of Concord were separately operated, the computer equipment Cape used did not directly manufacture the newspaper because the final step, printing, was completed by Concord.

The Director cites *Copperweld Steel Co. v. Lindley,* 31 Ohio St.3d 207, 509 N.E.2d 1242 (Ohio 1987), claiming involvement by two corporations in "manufacturing" a product breaks the direct link. In *Copperweld* the Ohio Supreme Court essentially held that transporting waste to a separate corporation was not a part of the manufacturing process. *Id.* 509 N.E.2d at 1248. Likewise, this Court has also held that merely transporting a finished product is not manufacturing. *See West Lake Quarry,* 451 S.W.2d at 143. However, these holdings have nothing to do with the present case. Concord was not a mere recipient of waste or an end product, but was an essential participant in the effort to manufacture a newspaper. The exchange between Cape and Concord occurred as a coordinated and necessary step in the manufacturing process, not as mere by-product disposal.

The reasoning of *Central Paving Co. v. Idaho Tax Commission,* 126 Idaho 174, 879 P.2d 1107 (Idaho 1994), is more persuasive and more analogous to our own situation. In *Central Paving* the Idaho Supreme Court held a rock crushing machine owned by one company and used to crush another company's rock for the second company's use in manufacturing cement was tax exempt. "If the statute's purpose is to exempt materials and equipment used in the manufacture of items ultimately sold at retail then it makes no difference whether the manufacturing process is contracted out to various parties who never obtain title to or ownership of the product being manufactured and items ultimately sold." *Id.* at 177, 879 P.2d at 1110.

■ In the present case Cape merely contracted Concord's press division to print the newspaper from the negative. The negative was useless without the final step of printing, and the newspaper likewise could not have been printed without the negative. The operations, even by separate corporate entities, were "integrated and synchronized" to the single purpose of producing and selling SEMO. *12 CSR 10-3.326(3).* The integrated plant doctrine can span two corporate entities as long as both businesses work together to manufacture a single product. Both Cape and Concord manufactured SEMO and both qualify for manufacturing exemptions.[8]

(iii)

■ The Director also suggests that because the publishing operation is physically separated from the printing press the computer equipment is not an integral part of manufacturing the newspaper. The Department of Revenue's regulations instruct us to consider physical location when deciding whether machinery is "directly used" in manufacturing. *12 CSR 10-3.326(2).* However, physical distance alone is not determinative. We have previously permitted the exemption for equipment used in a different location from a manufacturing plant. *See Noranda,*

---

**8.** Further weakening the Director's argument is the fact that Cape and Concord had actually merged by the time pagination was implemented.

599 S.W.2d at 4 (exemption allowed for laboratory equipment located in separate building). We have also recognized that portions of a newspaper may be produced in separate locations and by separate corporations, but still be considered part of one publication. *Daily Record Co. v. James,* 629 S.W.2d 348, 351 (Mo. banc 1982).

The composition and editing process is as essential to manufacturing a newspaper as the printing press, regardless of whether it is located in the same building or across town. We find the physical distance between the operations in this case does not break the direct tie between the composition and printing of SEMO.

(iv)

■ Finally, the Director argues that even if the pagination system directly manufactures the newspaper, the laptop or portable computers were only used to take notes at an event, not to process the information and were, therefore, not necessary or integral to the pagination process. She argues they merely deliver the information to the editing computers and are not themselves involved in the editing process. We believe equipment used to record information is part of the manufacturing process as well. Recording is the first step in processing words into a newspaper.

In the present case, the laptop computers not only record information but allow for its immediate editing, even in the field. In essence, the laptop computers extend SEMO's editing process to locations where news events occur, speeding up the editing process. As the AHC found, "The portable computers allow the reporter to convert his or her account of events immediately to electronic transmissions that the reporter can deliver to the office computer network via telephone modem or after he or she gets back to the office." *AHC opinion at 16.* Because of this capability, SEMO is able to carry more current news. Like the other equipment at issue, the laptop computers are an integral part of manufacturing the SEMO.

IV. Design or Product Changes

(A)

■ The Director argues that the computer equipment was not purchased to facilitate a product change as required by the statute, but rather to replace old office equipment. Section 144.030.2(4) allows an exemption for equipment replaced "by reason of design or product changes". A "design change" is a modification in the manufacturing machinery or equipment, whereas a "product change" results in a different or improved product. *Floyd Charcoal,* 599 S.W.2d at 179.

(i) Replacement Equipment

Department of Revenue regulations provide that equipment replaced "because the present machine cannot do the work" due to changes in the product or manufacturing process is tax exempt, while equipment replaced because of age or obsolescence is not. *12 CSR 10–3.316(2).* The record shows the equipment at issue was purchased to implement the pagination process because the previous computers, though functional, could not be networked together. The computer equipment purchased was "replacement" equipment.

(ii) Design Change

The Director does not dispute there was a design change. There was a design change because the computer equipment purchased changed the manufacturing process of the SEMO to pagination. The newspaper is now compiled electronically, instead of manually. Some tiling equipment is no longer used. Reporters can transmit stories directly from the scene of an event. The computer equipment modified the SEMO's manufacturing process.

(iii) Product Change

The design change was implemented to facilitate a product change. The paper now has a more appealing format, a new masthead, and is more competitive with other media. SEMO now contains more color pictures. All pictures are printed at a higher quality. Because it takes less time to create

the negative, the deadlines have been extended and SEMO prints more current news. Only through pagination were these changes possible.

The Director claims there was no product change. She argues that each edition of a newspaper looks different than the previous editions and if we recognize the listed changes as a "new product" then each edition of a newspaper would also be a product change.[9]

We do not need to examine each new edition of the newspaper to find a product change in this case. We need only compare the pre-pagination SEMO with the post-pagination SEMO. The record shows that the changes are more permanent than daily changes in the layout and reporting. For instance, the number and quality of the color pictures the newspaper ran increased. This change did not occur in just one edition, but in all subsequent editions after pagination was implemented. Likewise the new masthead and the increase in current information due to later deadlines will benefit all future editions. We find that the equipment purchased was used to implement both a design and a product change because of the permanent changes in the format of the paper.

(B)

■■■ The Director argues that none of these changes occurred until October 1993, when the pagination system was actually implemented, a year after the audit periods. She argues that by allowing the taxpayer to claim an exemption for changes that did not occur until after the tax period we would expand the scope of 144.030.2(4) beyond its language.

The statute allows an exemption for equipment that replaces other equipment "by reason of a design or product change." The taxpayers' equipment was purchased "by reason of", or for the purpose of, implementing a

new manufacturing process and creating a new and better product. Furthermore, the taxpayers have implemented these changes.[10] The statute does not specify when the equipment must be used, only that it is used in an exempt manner.

■■■ Statutes must be given a "common sense and practical interpretation." *State ex rel. Dravo Corp. v. Spradling,* 515 S.W.2d 512, 516 (Mo.1974). Common sense dictates that we allow the exemption here. Replacing manufacturing equipment can be expensive. Many small businesses cannot afford to replace all of their machinery at once. Often, they must acquire it slowly. The record shows that implementing pagination is a major capital expense and many newspaper publishers must acquire equipment over a period of time. It is unreasonable to expect all businesses to pay for and make major production changes all in one tax year in order to qualify for the exemption. "The exemption serves to lessen the burden inherent in the purchase of new and replacement equipment." *Bridge Data,* 794 S.W.2d at 206. To hold that the implementation of a new process must occur within the same tax year as the purchase would unnecessarily discriminate against small businesses and hinder their investment in new technology.

Furthermore, a regulation promulgated under § 144.030.2(5) exempts machinery purchased to increase production volume, even if the increase is potential but has not been actualized. *12 CSR 10–3.320(4)(B)(1).* Sections 144.030.2(4) and (5) are often used together and both were intended to encourage industry in Missouri. *Ozark Lead,* 610 S.W.2d at 957; *Floyd Charcoal,* 599 S.W.2d at 177. There is no reason to allow exemptions for a future use under one statute, but not the other.

## V. Expand Existing Manufacturing

■■■ An exemption is also provided under § 144.030.2(5) for manufacturing machinery

---

9. In *The Kansas City Star Co. v. Director of Revenue,* No. 94–000755RV, 1995 (Mo.Admin.Hearing Comm'n, Feb. 6, 1995), the Commission determined that each daily edition of a newspaper was a new product. As discussed above, we need not make such an expansive holding in this case.

10. We reserve deciding upon what evidence an exemption should be allowed for a taxpayer who has not yet implemented a design or product change.

and equipment "purchased and used ... to expand existing manufacturing." In the present case the AHC found that the equipment was purchased by Cape and Concord to increase their production because it was used to expand SEMO's publication from six days a week to seven. *AHC opinion at 17.*

The Director argues that this exemption is provided only to those who physically expand their manufacturing plants, and not merely for an increase in production volume. Her argument is contrary to the department's own regulations which define "expansion" to also include increased production volume. *12 CSR 10–3.320(4)(A), (B).* She urges us to find this regulation erroneously interprets the expansion exemption.

The Director cites *Ozark Lead* and *Dravo Corp., supra,* as authority for her argument. Both of these cases allow an exemption for machinery purchased and used to physically increase the size of a production process but neither case limits the exemption solely to physical expansion.

■ We have previously allowed the exemption for items purchased without evidence of physical expansion. *Noranda,* 599 S.W.2d at 4 (laboratory equipment); *Bridge Data,* 794 S.W.2d at 206 (computer hardware). Furthermore, such a limited interpretation would unduly restrict the legislature's purpose in passing the exemption. The legislature did not intend to fill the Missouri landscape with towering industrial plants, but to increase the number of products on which sales tax could be assessed. We hold that machinery that increases production volume qualifies for the § 144.030.2(5) exemption. Because Cape and Concord purchased and used the equipment at issue to increase the production volume of SEMO, now printing more pages and producing newspapers seven days a week instead of six, the equipment is exempt under § 144.030.2(5).[11]

## VI.

■ The Director claims the taxpayers did not sufficiently prove they intended to use the equipment in an exempt manner at the time it was purchased because their sole witness did not have personal knowledge of the reasons the companies purchased the equipment and because no corporate documentation of intent was introduced into evidence.

■ Taxpayers must prove they are entitled to an exemption by clear and unequivocal evidence. *House of Lloyd v. Director of Revenue,* 824 S.W.2d 914, 919 (Mo. banc 1992). Cape and Concord's witness, Mr. Caldwell, became the business manager for Cape in December of 1990, after some of the equipment at issue had been acquired. As business manager, he served on the executive management team and was involved in all of the planning in the corporation. He testified that all of the equipment was purchased with the ultimate goal of implementing the pagination system.

■ The Director did establish on cross-examination that some of Mr. Caldwell's testimony may have exceeded his personal knowledge. However, on direct examination the Director only objected to two inconsequential questions on this basis. The Director also solicited a substantial amount of testimony again from Mr. Caldwell on cross-examination regarding these issues. No objection or motion to strike was made to the bulk of Mr. Caldwell's testimony.

■ Had the Director properly preserved the evidentiary issue before the AHC and before us, it could have been considered. Statements in violation of evidentiary rules do not qualify as competent and substantial evidence to impose sales tax, when proper objection is made and preserved. *State ex rel. DeWeese v. Morris,* 221 S.W.2d 206, 209 (Mo.1949). However, hearsay testimony may be considered if no objection is made. *Mills v. Federal Soldiers Home,* 549 S.W.2d 862,

---

11. The AHC also found that the equipment was purchased by the taxpayers "to expand their usable square footage." *AHC opinion at 17.* Because we hold the equipment exempt due to the expansion of production volume, we need not address whether the expansion of usable square footage through the purchase and implementation of a more condensed production process is exempt at this time.

867 (Mo. banc 1977). In fact, all probative evidence received without objection in a contested case must be considered in administrative hearings. *§ 536.070(8)*. The Director did not object or move to strike a majority of Mr. Caldwell's testimony. Having waived the admissibility issue as to this evidence, appellant may not raise it now by arguing the sufficiency of the evidence to support the AHC's findings. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995).

Apparently the Director chose not to argue this issue as a matter of admissibility but to leave it as an attack against the weight or persuasiveness of the evidence. Unfortunately for the Director, the commissioner found Mr. Caldwell's testimony persuasive. The testimony, as admitted without objection, established clear and unequivocal evidence to support the AHC's finding that Cape and Concord purchased the equipment with the intent to implement pagination, creating a new product and changing the design of their production system.

There is no basis in law for the Director's contention that this element cannot be established by oral testimony apart from written documentation.

### VII.

Even if the exemptions are valid, the Director disputes whether Concord may benefit from them because Cape, not Concord, used the equipment in an exempt manner. Sections 144.030.2(4) and (5) exempt machinery "purchased and used" in an exempt manner and the Director claims this language should only apply to taxpayers who both purchase and use the equipment themselves.

In so arguing, the Director once again contradicts the Department of Revenue's own regulations: "The sales tax exemptions for machinery and equipment used directly in manufacturing a product for sale do not require that machinery be purchased by the owner of the facility or even that the purchaser be the one who uses the machinery in an exempt fashion. All that is required is that the machinery and equipment itself be used in a tax exempt fashion." *12 CSR 10-3.327*.

The § 144.030.2(5) exemption "does not refer to the *identity* of the user, but only to a use for the designated purpose." *Dravo Corp.*, 515 S.W.2d at 515. We likewise apply this reasoning to § 144.030.2(4). As long as the equipment was purchased for and subsequently used in an exempt manner, we are not concerned which company purchased it. Both Cape and Concord qualify for the exemptions under § 144.030.2(4) and (5) because the equipment was purchased by both corporations to be used, and is presently used, in an exempt manner.

We affirm the decision of the Administrative Hearing Commission except as to the Power Flex computer and the Apple DTB Mouse discussed in footnote three. As to these items the AHC is reversed.

HOLSTEIN, C.J., BENTON, ROBERTSON and COVINGTON, JJ., PREWITT, Special Judge, and WILSON, Senior Judge, concur.

LIMBAUGH and WHITE, JJ., not sitting.