SOUTHWESTERN BELL
TELEPHONE COMPANY, Appellant,

v.

DIRECTOR OF REVENUE,
Respondent.

No. SC 83859.

Supreme Court of Missouri,
En Banc.

June 11, 2002.

Juan D. Keller, John P. Barrie, B. Derek Rose, St. Louis, Edward F. Downey, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan-Scott, Deputy State Solicitor, Jefferson City, for Respondent.

WILLIAM RAY PRICE, JR., Judge.

"This is another case requiring the application of a statutory framework that

first took shape in the thirties and forties to the technology of the eighties and nineties." *Bridge Data Co. v. Director of Revenue*, 794 S.W.2d 204, 205 (Mo. banc 1990).

## I.

Southwestern Bell Telephone Company ("Bell") appeals a decision by the Administrative Hearing Commission ("AHC"), denying Bell a refund of use tax paid on machinery used to provide basic and vertical telephone services. *GTE Automatic Elec. v. Director of Revenue* held in 1989 that telephone services were not products for the purpose of the sales and use tax exemptions. 780 S.W.2d 49 (Mo. banc 1989). The rationale supporting *GTE* was seriously eroded by *Bridge Data*, 794 S.W.2d 204, and *Concord Pub. House, Inc. v. Director of Revenue*, 916 S.W.2d 186, 189 (Mo. banc 1996). *International Business Machines Corp. v. Director of Revenue* expressly overruled *GTE*, concluding that "a product is an output with a market value, it can be either tangible personal property or a service." 958 S.W.2d 554, 557 (Mo. banc 1998). In this case, *IBM's* lead is followed; telephone services constitute the "manufacturing" of "products" for purposes of section 144.030.2, RSMo Supp. 1992, overruling whatever was left of *GTE*. The AHC decision is reversed, and the case is remanded.

## II.

Bell filed claims for a refund of use tax remitted during the second quarter of 1992 on the purchases of machinery and equipment used to produce basic telephone service and vertical telephone products.[1] Bell listed numerous items of machinery and equipment, including inventories, computers, electronic analog and digital switching devices, circuit equipment, and various other components involved in transmitting and processing information required for telephone communications and services.

A brief, if simplistic, overview of the mechanics of basic telephone service is useful. When a person picks up a telephone, a dial tone is produced by electrical currents flowing between the telephone and the central office switch.[2] Once the customer inputs the desired number, the central switch analyzes the electrical pulses or tones to determine the proper routing of the call. A separate system, called the SS7 signaling system, sends out a data message, which is used by the receiving switch to determine whether the line is free or busy. The caller then hears either the familiar ring or busy signal. If the person on the receiving end picks up the telephone, a voice connection is established. The vibrations of a person's voice are converted by the telephone into an analog signal. Depending on the type of switching office, the signal remains analog as it is transmitted or is converted into a digital signal.

An analog signal travelling over a telephone wire loses strength because of the resistance of the wires. The signal, along with any additional noises on the circuit,

---

1. The vertical telephone products are a number of services, including Bill Plus, Customer Billing Report, Detailed Billing Local Measured Service, CABS Bills on Floppy Disk, Caller ID, Anonymous Call Rejection, Auto Redial, Call Blocker, Call Forwarding, Selective Call Forwarding, Remote Access to Call Forwarding, Call Return, Call Trace, Call Waiting, Priority Call, Speed Call, and Three Way Calling.

2. A central switching office is a hub of loop facilities, or communications paths, for a specific geographic region. In other words, the loop facility connects the customer to the switching office. The various switching offices across the country are all connected by trunks and interoffice trunking facilities.

must be amplified to travel over long distances. If the switching office is analog, the signal is transported across the wire, amplified as necessary and then reconverted into a voice signal for the other listener.

If the switching office is digital, the analog signal is "sampled" at a very high rate into a digital signal.[3] This signal goes through the system and is converted into a voice signal on the other end. Instead of being a sound wave, a digital signal is transported as a package of data. Because it is digital data that can be regenerated, instead of being amplified, there is no risk of other noises being amplified with the voice data.

The vertical services operate in a similar manner. Various electrical signals and data are transported from one telephone, through the network and received by another telephone. Along the way, the information is manipulated by computers to provide various services, such as call-waiting or Caller ID.

The AHC concluded that basic telephone and vertical services were "products" within the meaning of sections 144.030.2(4) and (5). However, it concluded that telephone service is not manufacturing. Bell claims that the purchases and machinery and equipment are used to manufacture products within the meanings of those sections.[4]

### III.

■■■ This Court has jurisdiction pursuant to Mo. Const. art. V, section 3 and reviews the AHC's interpretation of revenue law de novo. *Concord Pub. House, Inc. v. Director of Revenue,* 916 S.W.2d 186, 189 (Mo. banc 1996). The AHC's factual determinations are upheld if they are supported by the law and, after reviewing the whole record, there is substantial evidence to support them. *DST Systems, Inc. v. Director of Revenue,* 43 S.W.3d 799, 800 (Mo. banc 2001); section 621.193, RSMo 2000.

### IV.

■■■ Bell claims that its purchases, which include both new and replacement machinery and equipment, fall under section 144.030.2, which provides sales and use tax exemption for:

> (4) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, replacing and used for the same purposes as the machinery and equipment replaced by reason of design or product changes, which is purchased for and used directly for manufacturing or fabricating a product which is intended to be sold ultimately for final use or consumption;

---

**3.** The process of converting analog to digital signals is called pulse amplitude modulation. First, the high and low frequencies of the analog signal are trimmed off because they cannot be heard well. Then, the analog signals are sampled 8,000 times per second. Each sample is coded so the samples can later be reconstructed to replicate the original analog sound. The process is completed by reproducing the digital signals, spaced one 125,000th of a second apart, to regenerate an analog signal that is similar to the original analog signal. The regenerated analog signal, however, is merely a replication of the analog signal.

**4.** Both basic and vertical telephone services are subject to sales tax at the retail level. Section 144.020(4), RSMo Supp.1992, imposes "[a] tax equivalent to four percent on the basic rate paid or charged on all sales of service to telephone subscribers and to others through equipment of telephone subscribers for the transmission of messages and conversations, both local and long distance, and upon the sale, rental or leasing of all equipment or services pertaining or incidental thereto."

(5) Machinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if such machinery and equipment is used directly in manufacturing, mining or fabricating a product which is intended to be sold ultimately for final use or consumption;

144.030.2(4)-(5), RSMo.[5]

## V.

The Director contends that Bell did not satisfy the three elements common to both subsections, that exemptions will only be given for (1) machinery and equipment (2) used directly in manufacturing (3) a product that is intended to be sold ultimately for final use or consumption.[6]

Over the last few decades, the growth of modern information and communication technologies has challenged lawmakers and courts to keep pace with modern industry. One area of specific difficulty in Missouri has been the application of the manufacturing sales and use tax exemptions to intangible products or services. Two somewhat interrelated issues, the definitions of "product" and "manufacturing", have been at the heart of this jurisprudence.

### A. Product

■ Missouri first considered the exemption status of basic telephone service in *GTE Automatic Elec. v. Director of Revenue*, 780 S.W.2d 49 (Mo. banc 1989). In a 4–3 decision, *GTE* held telephone service companies were not entitled to an exemption under the statutes. The decision rested on two related rationales. First, *GTE* squarely held that voice transmission was a "service," not a "product," and that section 144.030.2 limited the exemption to products. As the Director concedes, this issue was dispositive.[7] Second, the Court also touched on the issue of whether telecommunications constitutes "manufacturing", which is discussed below.

The very next year, *Bridge Data* substantially undercut the "product" centered rationale of *GTE*. 794 S.W.2d 204. In *Bridge Data*, the Court allowed an exemption for equipment used to collect, process and transmit financial data, holding that "[t]he statute contains no explicit requirement that the product be 'tangible' in order for the manufacturing exemption to apply." 794 S.W.2d at 206.

The next decision in this line was *Concord Pub. House, Inc. v. Director of Revenue*, 916 S.W.2d 186, 189 (Mo. banc 1996). In that case, the Court reaffirmed the holding and rationale of *Bridge Data* that "organizing information through computer technology is 'manufacturing'" and that

---

5. The statute has since been amended. Tax consequences are governed by the law in effect at the time of the transaction in question. *In re Armistead*, 362 Mo. 960, 245 S.W.2d 145 (Mo.1952); Mo. Const. art. I, sec. 13.

6. The elements not common to both include requiring proof that replacement machinery or equipment was purchased (a) to replace existing equipment (b) by reason of design or product changes, 144.030.2(4), and proof that new machinery or equipment is used to establish new or expand existing manufacturing 144.030.2(5).

7. "[W]e feel the more pertinent inquiry is whether the output of the equipment is a product or a service." *GTE*, 780 S.W.2d at 50. The Director stated in its brief, "*GTE* is admittedly of limited value in some respects, because the majority did not squarely address Appellant GTE's central argument, which was whether it engaged in manufacturing. The Court focused on a separate, and ultimately dispositive, issue."

the exemption applied to electronic equipment "even though the final product was intangible." 916 S.W.2d at 191.

Finally, the "product" holding of *GTE* was expressly overruled in *International Business Machines Corp. v. Director of Revenue*, 958 S.W.2d 554, 557 (Mo. banc 1998). *IBM* allowed an exemption for equipment used to analyze financial data and to transmit this data to customers, either in hard copy or electronic form. *IBM* specifically stated: "Because a product is an output with a market value, it can be either tangible personal property or a service. To the extent inconsistent with this opinion and the recent cases, *GTE's* discussion of the term 'product' should no longer be followed. 780 S.W.2d at 50–52." 958 S.W.2d at 557.

### B. Manufacturing

Though only squarely holding that telephone service is not a "product", *GTE* also touched on the issue of whether telecommunications constitutes "manufacturing". Primarily, the Court determined that because telephone service was not a product, it could not be manufactured. The Court also discussed the manufacturing issue in terms of other non-communications cases. A brief review of those cases is helpful.

Manufacturing has been described both as a process that "takes something practically unsuitable for any common use and changes it so as to adopt it to such common use." *GTE*, 780 S.W.2d at 51, *quoting West Lake Quarry & Material Co. v. Schaffner*, 451 S.W.2d 140, 143 (Mo.1970), and as the production of raw materials into "products for sale which [have] an intrinsic and merchantable value." *GTE*, 780 S.W.2d at 51, *quoting Heidelberg Central, Inc. v. Director of Dept. of Revenue*, 476 S.W.2d 502, 506 (Mo.1972).

Manufacturing cases can essentially be divided into two categories. *L & R Egg Co. v. Director of Revenue* 796 S.W.2d 624, 628 (Mo. banc 1990) (Holstein, J., dissenting). The manufacturing exemption is upheld for machinery and equipment that "modifies a raw product before reaching the consumer so that the product has a use and value it did not have prior to the modification."[8] *Id.* However, the exemption is not applicable to machinery used merely "as part of the cycle of repair, restoration or cleaning after the finished product has reached the consumer."[9] *Id.*

The *GTE* Court reasoned that telephone service did not fit comfortably into these definitions. It noted that the human voice was the input into the telephone and that it was not "practically unsuitable for any common use." The Court also reasoned that telephone services failed the second definition because telecommunications did not create a product, but it was instead a service. The only "product", *GTE* reasoned, was the human voice, which has no intrinsic value.

---

8. Using these definitions, exemptions have been upheld for machines that break and shape stone into salable goods, *West Lake Quarry & Material Co. v. Schaffner*, 451 S.W.2d 140 (Mo.1970), printing presses used to develop printed business materials, *Heidelberg Central Inc. v. Director of Dept. of Revenue*, 476 S.W.2d 502 (Mo.1972), processing pigs into various meat products, *Wilson & Co., Inc. v. Department of Revenue*, 531 S.W.2d 752 (Mo.1976), processing ground water into drinking water, *Jackson Excavating Co. v. Administrative Hearing Com'n*, 646 S.W.2d 48 (Mo. banc 1983), and shredding and shaping scrap metal into salable pieces, *Galamet, Inc. v. Director of Revenue*, 915 S.W.2d 331 (Mo. banc 1996).

9. The exemption has not been given for machinery and equipment used to repair tires by recapping and retreading them, *State ex rel. AMF Inc. v. Spradling*, 518 S.W.2d 58 (Mo. 1974), clean and repair garments, *Unitog Rental Services, Inc. v. Director of Revenue*, 779 S.W.2d 568 (Mo. banc 1989), and clean and sort eggs, *L & R Egg.*

Primarily, this argument is so dependent upon the premise that an intangible product cannot support the exemption, that it falls of its own weight after *IBM*. Moreover, *IBM* also expressly confirmed that "organizing information through computer technology is 'manufacturing.'" 958 S.W.2d at 557.

Additionally, the *GTE* reasoning was simply incorrect. Although the human voice may not be unsuitable for common use, it is unsuitable for communication that must occur over any appreciable distance. It cannot be heard from residence to residence, from office to office, or from town to town. The listener requires that the voice be "manufactured" into electronic impulses that can be transmitted and reproduced into an understandable replica. The end "product" is not the same human voice, but a complete reproduction of it, with new value to a listener who could not otherwise hear or understand it. Even *Bridge Data* noted that the *GTE* statement that the same voice comes out as goes in, was a fiction inconsistent with the modern understanding of physics. 794 S.W.2d at 206.

Basic telephone service and the various vertical services involved herein are intangible products that are manufactured. Whatever is left of *GTE* after *Bridge Data, Concord Publishing,* and *IBM,* is overruled.

## VI.

The Director contends that machinery for certain vertical services should not be exempted because the services were not offered for sale until after the tax period at issue. *Concord* allowed a similar exemption. 916 S.W.2d at 194. "The statute does not specify when the equipment must be used, only that it is used in an exempt manner." *Id.* The Director argues that this holding is limited to small businesses, such as Concord Publishing House, Inc.,

and should not apply to large companies such as Bell. While *Concord* involved small business taxpayers, the statute does not specify any particular "size" of the taxpayer.

## VII.

■ Finally, the Director argues that this decision is unexpected and should only be applied prospectively. A court decision is unexpected when a "a reasonable person would not have expected the decision or order based on prior law, previous policy or regulation of the department of revenue." Section 143.902.2, RSMo 2000. The only explicit holding of *GTE* was overruled in *IBM*. The secondary rationale supporting the *GTE* decision was clearly at odds with our more recent case law regarding the definition of "manufacturing". *Concord,* 916 S.W.2d 186; *IBM,* 958 S.W.2d 554; *DST Systems,* 43 S.W.3d 799. A reasonable person would have expected this decision.

## VIII.

Because the AHC rested its decision on its finding that telephone services were not the manufacturing of a product, Bell's claim requires further fact finding concerning whether the purchases were of "[m]achinery and equipment, and the materials and supplies solely required for the installation or construction of such machinery and equipment," in accordance with the exemption.

The AHC decision is reversed, and the case is remanded.

LIMBAUGH, C.J., WHITE, WOLFF, BENTON and LAURA DENVIR STITH, JJ., concur.

TEITELMAN, J., not participating.