**MID–AMERICA DAIRYMEN, INC. a Kansas corporation, Plaintiff–Appellant,**

v.

**Scott PAYNE, Collector of Revenue, Greene County, Missouri, Defendant–Respondent.**

**No. 22284.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 25, 1999.

Motion for Rehearing or Transfer
Denied Feb. 10, 1999.

---

Patrick E. D'Arcy, Patricia Kalb, Independence, for appellant.

Theodore L. Johnson, III, Randall J. Reichard, Springfield, for respondent.

ROBERT S. BARNEY, Judge.

Appellant Mid–America Dairymen, Inc. (Mid–America) filed a petition seeking a refund of overpayment of 1996 ad valorem taxes paid to Scott Payne, Collector of Revenue, Greene County, Missouri, (Collector) under protest. It averred that it was entitled to a tax abatement in the amount of $21,408.75 arising from its ownership and operation of two facilities located at 3233 and 3253 E. Chestnut Expressway in the City of Springfield, Greene County, Missouri. Mid–America is engaged in the business of manufacturing dairy products. The circuit court denied Mid–America's petition finding that the 3233 E. Chestnut facility "simply is not 'used for assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties,'" as required by the 1991 amendments to section 135.215, RSMo Cum.Supp.1983. *See* § 135.215.3, RSMo Cum.Supp.1991. This appeal followed.[1]

As best we can glean from Mid–America's two points of trial court error, it first contends that the circuit court erred in determining that Mid–America's new facility located at 3233 E. Chestnut did not qualify for ad valorem tax abatement under the 1991 amendments to section 135.215, RSMo Cum.Supp.1983. Secondly, Mid–America contends that the circuit court erred in denying its new facility a tax abatement under the older statutory provisions, as set out in sections 135.215 and 135.225, RSMo Cum.Supp.1983, and Springfield Special Ordinance No. 20470 (1986), which conferred ad valorem tax abatements for improvements to properties located in enterprise zones and owned by revenue producing enterprises such as Mid–America.

The litigants have stipulated to the relevant facts, discussed below. However, in order to understand Mid–America's points of error it is first necessary to

---

1. Mid–America appealed to the Supreme Court of Missouri, which in turn remanded the case to this Court. *See generally Alumax*

*Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907 (Mo. banc 1997).

review the pertinent provisions of the act in question. "The fundamental rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning." *State ex rel. Doe Run Co. v. Brown,* 918 S.W.2d 303, 306 (Mo.App.1996); *see also Trailiner Corp. v. Director of Rev.,* 783 S.W.2d 917, 920 (Mo.banc 1990). "Tax statutes are to be strictly construed in favor of the taxpayer and against the taxing authority." *Trailiner Corp.,* 783 S.W.2d at 920. "[E]xemption provisions are construed against the taxpayer." *Id.*

In 1982, the General Assembly enacted sections 135.200–135.255, RSMo 1982, known collectively as the Enterprise Zone–Urban Redevelopment Act (the Act). The Act was then amended in 1983 and 1986.[2] The Act authorized a governing authority to designate a portion of a city or unincorporated area of a county under its control as an enterprise zone. *See* §§ 135.205; 135.210, RSMo 1982. After the designation of an enterprise zone, qualifying "revenue-producing" enterprises which made improvements in these zones were to be entitled to various benefits, including a proportional abatement of ad valorem taxes. *See* §§ 135.215; 135.225(6), RSMo Cum.Supp.1983.

Pursuant to the enabling legislation, the City of Springfield enacted Special Ordinance No. 20470 on or about February 18, 1986, which provided in pertinent part that:

> [A]ll property located within the boundaries of the Enterprise Zone as designated on May 11, 1984, or as thereafter corrected or amended, which property is also owned by a revenue producing enterprise as defined in Section 135.225 RSMo.1983, qualified to receive tax abatement, shall be permitted to

claim an exemption from ad valorem taxes.

There is little question that prior to August 28, 1991, all improvements to real property located within an enterprise zone and owned by a "revenue producing enterprise" as defined under sections 135.215 and 135.225(6), RSMo Cum.Supp.1983; together with sections 135.215 and 135.200(5), RSMo 1986, were entitled to a real property tax abatement of no less than fifty percent for the first ten years of the designation of any such enterprise zone.

In 1991, the Act underwent further amendment, making it more restrictive in its grant of tax abatements. It provided, in pertinent part, at section 135.215.1, that after August 28, 1991:

> Improvements made to 'real property' . . . may upon approval of an authorizing resolution by the governing authority . . . be exempt in whole or in part, from assessment and payment of ad valorem taxes . . . provided that, except as to the exemption allowed under subsection 3 of this section at least fifty new jobs that provide an average of at least thirty-five hours of employment per week per job are created and maintained at the new or expanded facility.

§ 135.215.1, RSMo Cum.Supp.1991. Section 135.215.3 provided in pertinent part that:

> Notwithstanding subsection 1 of this section, one-half of the ad valorem taxes otherwise imposed on subsequent improvements to real property located in an enterprise zone shall become and remain exempt from assessment and payment of ad valorem taxes . . . *provided the improved properties are used for assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties.*

§ 135.215.3, RSMo Cum.Supp.1991(emphasis added).[3] Additionally, section 135.215.5 sets out that:

**2.** *See* L.1982 H.B. 1713, 1686, 1542 & 1791, p. 310, § 1(§ 5); amended by L.1983 H.B.

No. 559, p. 416, § 1, eff. July 8, 1983; L.1986 S.B. No. 727, § A.

**3.** On October 28, 1996, the City of Spring-

The provisions of subsection 1 of this section shall not apply to improvements made to real property which have been started prior to August 28, 1991.

§ 135.215.5, RSMo Cum.Supp.1991.

Among the stipulations of facts entered into by the parties were the following, partly-paraphrased facts:

(1) Mid–America's older facility at 3253 E. Chestnut "was completed prior to the creation of the Springfield Enterprise Zone's *expanded* boundaries as designated on April 22, 1991." [4] The primary function of the facility was to provide administrative support to Mid–America's business activities.

(2) In 1993, Mid–America began construction of a new facility at 3233 E. Chestnut, which was completed in October 1994, and is engaged in "[n]ew product development"; contains a "[q]uality [a]ssurance [l]aboratory"; is used to "to increase the efficiency of production techniques for both new and established products"; and is also "used to produce, package and ship to customers, and potential customers, small amounts of free samples of the products it produces on site in order to generate sales."

(3) "There has not been created at least fifty new jobs that provide an average of at least thirty-five hours of employment per week per job at the facility located at 3233 E. Chestnut Expressway at any time since its completion in October of 1994 through the end of 1996."

(4) Since October 1994 both facilities have been located within the Springfield Enterprise Zone's expanded boundaries as designated on April 22, 1991.

field, Missouri, enacted Special Ordinance No. 23045 implementing the new statutory grant as provided in § 135.215.3, RSMo Cum. Supp.1991.

**4.** The Springfield Enterprise Zone was first established on May 11, 1984. *See generally* § 135.200–255, RSMo Cum.Supp.1983.

(5) "Neither facility [at either 3233 E. Chestnut or 3253 E. Chestnut] is, in and of itself, an assembling, fabricating, processing, manufacturing, mining, warehousing or distributing facility, but each supports [Mid–America's] primary revenue producing activity of manufacturing dairy products . . . ."

(6) Mid–America's facility at 3233 E. Chestnut is "not directly engaged in assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties."

(7) Mid–America "is directly engaged in assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties *but not at either facility located at 3233 or 3253 E. Chestnut.*" (Emphasis added.)

(8) "The facility located at 3233 E. Chestnut . . . generally supports the activities conducted by [Mid–America] at other locations, which activities consist of assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties, *however, none of these activities are actually conducted at the 3233 E. Chestnut Expressway facility.*" (Emphasis added.) [5]

■ As a general rule, stipulations are controlling and conclusive, and courts are bound to enforce them. *Howard v. Missouri State Bd. of Educ.,* 847 S.W.2d 187, 190 (Mo.App.1993). Stipulations between parties should be enforced unless good cause is shown to the contrary. *Id.* A stipulation should be interpreted in view of the result which the parties were attempting to accomplish. *Id.*

■ Because it has been stipulated by the parties that the newer facility at 3233

**5.** The parties also stipulated that "[n]othing in [paragraphs 5 through 8, *infra*] should be construed so as to undermine either [Collector's] contention that no products are manufactured at 3233 E. Chestnut Expressway, or [Mid–America's] contention that the activities conducted at the facility are an integral part of [Mid–America's] overall manufacturing revenue producing activity."

Chestnut was created after the 1991 amendments to the Act and did not create at least "fifty new jobs that provide an average of at least thirty-five hours of employment per week per job," *see* § 135.215.1, RSMo Cum.Supp.1991, we determine that the real issue to be considered in Point One is whether Mid–America is correct in asserting that its facility at 3233 E. Chestnut, with all of its characteristics and functions, is "used for" manufacturing, or whether Collector is correct in asserting that the facility is not "used for" manufacturing because it does not, on site, independently manufacture completed products that are then sold on the market. *See* § 135.215.3, RSMo Cum.Supp.1991.

In our review of the case law in this area, we have found no cases interpreting the specific provisions of section 135.215.3, RSMo Cum.Supp.1991; nor have we found any statutory definition for "used for" in the context of the Act. The dictionary definitions of "used," and "for," fail to shed much light on what the legislature intended in enacting the foregoing statutory provision. WEBSTER'S NEW COLLEGIATE DICTIONARY (1977), gives these definitions for the word "used": "[1] employed in accomplishing something"; and "[2] that has endured use." Whereas, "for" is defined, *inter alia*, as "a function word used to . . . indicate purpose . . . an intended goal [or] . . . indicate the object or recipient of a perception, desire, or activity." While the parties have cited case law from other jurisdictions defining the terms "used in," and "used for," these cases involve interpretation of foreign statutes, foreign case precedents, and treatment of parochial terms of art such that they are of little assistance to us in our quest to ascertain the meaning of section 135.215.3, RSMo Cum.Supp.1991.[6]

We note that in *Floyd Charcoal Co. v. Director of Revenue*, 599 S.W.2d 173, 176–77 (Mo.1980) and *Noranda Aluminum v.*

*Missouri Dept. of Rev.*, 599 S.W.2d 1, 4 (Mo.1980), the Supreme Court of Missouri adopted the more expansive "integrated plant" (versus the "strict construction") approach in its interpretation of the phrase "used directly in manufacturing or fabricating a product," involving sales or use tax exemptions provided by section 144.030.3, RSMo 1969. There, the focus was on determining which particular pieces of machinery and equipment used in the manufacturing process would be allowed sales and use tax exemptions, as opposed to granting an ad valorem tax exemption to an entire facility located in an enterprise zone.

In our task of interpreting legislation, we are not generally guided by the definition of a single word or phrase. We instead look to the provisions of the whole law, and its object and policy. *See State v. Meggs*, 950 S.W.2d 608, 610 (Mo. App.1997). Accordingly, we discern that section 135.215.3, RSMo Cum.Supp.1991, read in the context of the Act, as amended, is more restrictive than previous versions in its grant of tax abatements. As previously set out, the version passed in 1991 allows ad valorem tax abatements for "subsequent improvements" to real property located in an enterprise zone *"provided the improved properties are used for assembling, fabricating, processing, manufacturing, mining, warehousing or distributing properties."* § 135.215.3, RSMo Cum.Supp.1991 (emphasis added). The foregoing italicized words, as enacted by the legislature in 1991, constitute a departure from past legislative policy granting tax abatements to "all subsequent improvements to real property encompassed thereby which is owned by a revenue producing enterprise . . .," § 135.215, RSMo 1986, and shifts the focus of the section from the business entity as a whole to the specific facility or specific improvement to the property, directly engaged in the par-

---

**6.** *See generally NRA Special Contrib. Fund v. Bd. of County Comm'rs*, 92 N.M. 541, 591 P.2d 672 (N.M.Ct.App.1978); *Peat Marwick Main & Co. v. New York City Dept. of Fin.*, 76 N.Y.2d 527, 561 N.Y.S.2d 695, 563 N.E.2d 9 (N.Y.1990); *City of Winchester v. American Woodmark Corp.*, 250 Va. 451, 464 S.E.2d 148 (Va.1995).

ticular activities set out in the legislation. § 135.215.3, RSMo Cum.Supp.1991. "Missouri Courts do not presume that the legislature enacts meaningless provisions." *Parrott v. HQ, Inc.,* 907 S.W.2d 236, 240 (Mo.App.1995). The general presumption is that the legislature acts with the knowledge of statutes involving similar or related subject matters. *Moore v. Missouri–Nebraska Express, Inc.,* 892 S.W.2d 696, 712 (Mo.App.1994). "When the legislature amends a statute, it is presumed to have intended the amendment to have some effect." *Parrott,* 907 S.W.2d at 240. In light of the stipulations of the parties as previously set out, *supra,* and recalling that "[t]ax exemption statutes are construed strictly against the taxpayer and the burden is on the taxpayer to prove entitlement to the exemption," *Indian Lake Property Owners Ass'n, Inc. v. Director of Revenue,* 813 S.W.2d 305, 306 (Mo. banc 1991), we determine that under section 135.215.3, RSMo Cum.Supp.1991, Mid–America did not conduct any of the activities specified in said section at its 3233 E. Chestnut facility, such as to qualify for ad valorem tax abatement. Point denied.

■ In Point Two, Mid–America essentially contends that it has a vested right under the provisions of sections 135.215 and 135.225, RSMo Cum.Supp. 1983, and Springfield Ordinance No. 20470, to a tax abatement from ad valorem taxes because it made "improvements" to a "revenue producing enterprise." We disagree.

■ The Missouri Constitution "condemns laws that *operate* retrospectively." *Beatty v. State Tax Comm'n,* 912 S.W.2d 492, 496 (Mo. banc 1995). "A statute operates retrospectively—is retroactive—if it takes away or impairs a vested or substantial right or imposes a new duty in respect to a past transaction." *Id.* "The constitutional inhibition against laws retrospective in operation ... does not mean that no statute relating to past transactions can be constitutionally passed, but rather that none can be allowed to operate

retrospectively so as to affect such past transactions to the substantial prejudice of parties interested." *Fisher v. Reorganized School Dist., Etc.,* 567 S.W.2d 647, 649 (Mo. banc 1978). "Furthermore, a vested right ... must be something more than a mere expectation based upon an anticipated continuance of the existing law." *Id.* "It must have become a title, legal or equitable, to the present or future enjoyment of property or to the present or future enjoyment of the demand, or a legal exemption from a demand made by another." *Id.* "In general, neither persons nor entities have a vested right in a general rule of law or legislative policy that would entitle either to insist that a law remain unchanged." *Beatty,* 912 S.W.2d at 496; *see also State v. Thomaston,* 726 S.W.2d 448, 460 (Mo.App.1987). Just as the "intent to tax and not to exempt is indicated where the General Assembly has abolished a pre-existing exemption, *St. Louis County Library Dist. v. Hopkins,* 375 S.W.2d 71, 77 (Mo.1964), the same principle holds true when the General Assembly has modified the privilege of obtaining a pre-existing exemption.

■ There has been no retrospective operation of law in this case. Since Mid–America began construction of its new facility in 1993, after the 1991 amendments, discussed *infra,* Mid–America is legally presumed to be have been aware of the more stringent requirements regarding ad valorem tax abatements for improvements made to real property located in an enterprise zone. *See Missouri Highway & Transp. Comm'n v. Myers,* 785 S.W.2d 70, 75 (Mo. banc 1990)(as a general rule, every person is conclusively presumed to know the law); *Shumate v. Dugan,* 934 S.W.2d 589, 595 (Mo.App. 1996) (parties cannot normally avoid an act or deed on the ground that they were ignorant of the law). Additionally, Mid–America cannot avail itself of the fact that Special Ordinance No. 20470 remained unchanged by the City of Springfield until

October 28, 1996. Although an ordinance is presumed to be valid and lawful, *McCollum v. Director of Revenue,* 906 S.W.2d 368, 369 (Mo. banc 1995), "[a] municipal ordinance must be in harmony with the general law of the state and is void if in conflict." *Morrow v. City of Kansas City,* 788 S.W.2d 278, 281 (Mo. banc 1990). "The powers granted a municipality must be exercised in a manner not contrary to the public policy of the state and any provisions in conflict with prior or subsequent state statutes must yield." *Id.* We have already determined that Mid–America's new facility did not qualify for ad valorem tax abatement under the terms of § 135.215, RSMo Cum.Supp.1991; accordingly, Ordinance No. 20470 cannot be interpreted as granting a tax abatement exemption not otherwise permitted by § 135.215, RSMo Cum.Supp.1991. *See id.* Point denied.

The judgment is affirmed.

GARRISON, C.J. and SHRUM, P.J., concur.