**DST SYSTEMS, INC., Appellant,**

v.

**DIRECTOR OF REVENUE,**
Respondent.

No. SC 82797.

Supreme Court of Missouri,
En Banc.

April 10, 2001.

J. Kent Lowry, Matthew D. Turner, Sherry L. Doctorian, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Alana M. Barragan–Scott, Asst. Atty. Gen., Jefferson City, for Respondent.

WOLFF, Judge.

DST Systems, Inc.,[1] challenges the director's denial of sales and use tax exemption for mainframe computers and various other materials that DST purchased and purportedly used to expand its manufacturing plant and to produce products that were intended ultimately to be sold for final use or consumption. Section 144.030.2(5).[2]

◼ Stating that it was bound by our decision in *International Business Machines Corp. v. Director of Revenue*, 958 S.W.2d 554 (Mo. banc 1997), the administrative hearing commission denied DST's claim for exemption. This action involves construction of the revenue laws; we have jurisdiction. *Mo. Const. art. V, section 3.* This Court's review of the commission's interpretation of revenue laws is de novo, and the commission's factual determinations are upheld if they are supported by the law and, after looking at the whole record, there is substantial evidence to support them. *L & R Egg Co. v. Director of Revenue*, 796 S.W.2d 624, 625 (Mo. banc 1990); Section 621.193.

For reasons that follow, DST Systems, Inc., established that the mainframe computers and the other materials were used in manufacturing products that were intended to be sold ultimately for final use or consumption; therefore, it established a right to the exemption under section 144.030. We reverse and remand for determination of the specific items directly used in manufacturing, to which the sales tax exemption applies.

**Factual Background**

The facts found by the commission are supported by the evidence. They are summarized here. DST has a number of facilities in the Kansas City, Missouri, area, including its Winchester Data Center, which houses mainframe computers. The Winchester facility was expanded over a period of years from six mainframe computers in 1992 to 11 mainframe computers as of the date of the commission's decision. Its facility was expanded from 30,000 square feet to approximately 74,000 square feet between 1994 and 1995.

In 1991, DST formed Output Technologies, Inc., a wholly-owned subsidiary, as a holding company for businesses involved in providing printed output processing services to the mutual fund and financial services industries. Output Technologies acquired Mail Processing Systems, Inc., a financial printing and mailing business with facilities in Connecticut and Massa-

---

1. Data Switch is also a petitioner, as it was a petitioner in case No. 93–1298 RV, which the administrative hearing commission, upon the motion of Data Switch, consolidated into DST's case, No. 98–1037 RV. However, as DST states, DST is the real party in interest. This is because DST was the purchaser of the equipment from Data Switch, which claimed a sales/use tax refund under section 144.190.2 from the state of Missouri for the machinery and equipment purchased by DST. Any tax refund Data Switch would receive would go to DST. Thus, throughout the opinion references to "DST" will refer not only to the interests of DST, but to those of Data Switch to the extent it relates to its claim.

2. All references are to RSMo 2000, unless otherwise indicated.

chusetts, and opened seven new locations through a wholly-owned subsidiary, United Micrographics Systems, Inc., a provider of computer process microfilm and microfiche. By the end of 1992, Output Technologies had 29 locations throughout the United States. Support Resources, Inc., is a subsidiary of Output Technologies and prints materials including shareholder reports. DST and Support Resources are separate companies, with separate officers, directors, and accounts. Output Technologies–Support Resources has a complex of buildings in Kansas City, approximately eight or nine miles from the DST Winchester facility.

DST performs accounting and transfer agent functions for approximately 3,000 mutual funds with some 50 million mutual fund accounts. A transfer agent performs record keeping and servicing functions for the funds, which may include taking calls from customers, opening accounts, processing mail, and processing purchases and sales of mutual fund shares. DST performs all of these functions for some mutual funds and employs approximately 1,500 persons who perform these functions.

DST's related companies, Output Technologies and Support Resources, perform package production operations for mutual funds and other DST customers. Package production operations include the production of printed materials such as transaction confirmations and quarterly and annual reports to shareholders.

The package production of such reports, including printing, is done at the Output Technologies–Support Resources facilities, which are connected to the DST mainframe computers of the Winchester facility by specialized telecommunications transmission lines. The mainframes at the Winchester facility are essential to the printing operation at Output Technologies–Support Resources.

Output Technologies–Support Resources uses approximately 15 to 20 percent of the computer capacity at Winchester, and another 20 to 25 percent of the Winchester capacity is maintained by DST as a buffer to accommodate unpredicted increases. Not all of DST's customers use the services of Output Technologies–Support Resources. Approximately 10 to 15 percent of DST's mutual fund customers do not use the printing production. Output Technologies–Support Resources sometimes services customers other than those of DST. However, Output Technologies–Support Resources still must rely on the mainframes at the Winchester facility for such work. After the reports are printed, DST does not store the information on its mainframe computers, but stores quarterly report information on direct access storage devices for purposes of archiving.

The growth in the mutual fund industry created the need for increasing DST's computer capacity, and in the 1990's, DST expanded its capacity by approximately 30 percent annually. Output Technologies–Support Resources experience peak periods when they must send reports to the mutual funds shareholders; for quarterly reports, these related companies must send 8 to 9 million packages (approximately 30 million pages) in a five day-period. For annual reports, Output Technologies–Support Resources must send 30 million packages (approximately 90 million pages) in 20 days.

Output Technologies–Support Resources remit sales tax on printed materials. Through an arrangement with the department of revenue, Output Technologies–Support Resources calculates the sales tax on the printed materials based on the percentage of each mutual fund's shareholders who live in Missouri. The director of revenue has agreed that Output Technologies–Support Resources is a manufacturer.

While all of the printed material produced through the combined efforts of DST and Output Technologies–Support Resources is subject to sales tax, approximately three to five percent of the printed material is directed to shareholders in the state of Missouri, upon which the tax is collected. From 1989 through 1998, Output Technologies–Support Resources remitted $3,159,653.23 in sales tax to the state.

## The Exemption Claim

DST paid sales and use tax under protest on purchases of items that DST claims were exempt because the items were used for plant expansion. The tax periods and the amounts claimed were as follows:

| Tax Period | Tax Amount | Interest | Additions |
|---|---|---|---|
| 9/95–12/97 | $5,499,978.45 | 500,372.15 | – |
| 10/92–8/95 | $5,200,000.00 | $1,800,000 | – |
| 2/98 | $ 33,032.95 | – | – |
| 1/98 | $ 93,843.47 | $ 33.30 | $519.44 |
| 3/98 | $ 44,622.36 | – | – |
| 4/98 | $ 4,239.82 | – | – |
| 5/98–6/98 | $ 29,876.84 | – | – |
| 7/98 | $ 22,504.39 | – | – |

The items upon which DST claimed an exemption included mainframes, direct access storage devices, and scanners. DST also claimed an exemption for air conditioning equipment and for raised flooring, including carpet tiles, necessary to maintain the temperature-controlled environment at the Winchester facility. Additionally, it claimed an exemption on purchases of software and payment of software license fees.

The foregoing exemption claims also include materials other than those used in mainframe processing and other than those used at Winchester. The DST exemption claim includes equipment located at the DST mail center and equipment such as desktop computers and telephones located at employee work stations. The claim also includes equipment used in the DST image data center. The DST energy center, which assures DST of an uninterruptible power supply, has batteries and backup generators that are part of the DST exemption claim.

DST claims that its purchases are exempt under section 144.030.2(5), which provides a sales and use tax exemption for:

> Machinery and equipment, and parts and the materials and supplies solely required for the installation or construction of such machinery and equipment, purchased and used ... to expand existing manufacturing ... plants in the state if such machinery and equipment is used directly in manufacturing ... a product which is intended to be sold ultimately for final use or consumption. . . .

DST, as a purchaser, paid the sales and use tax to the director under protest as allowed by section 144.700.

This Court dealt with computer equipment sold to DST by IBM, in *International Business Machines Corp. v. Director of Revenue,* 958 S.W.2d 554, and denied an exemption under section 144.030.2(5), quoted above. As in the present case, evidence in the *IBM* case established that DST used the machinery and equipment to expand an existing plant.[3] This Court reiterated that "organizing information through computer technology is 'manufacturing.' " *Id.* at 557 (quoting *Concord Publishing House, Inc. v. Director of Revenue,* 916 S.W.2d 186, 191 (Mo. banc 1996)).

However, the claim for exemption failed because IBM as seller failed to establish that DST made a "product which is intended to be sold ultimately for final use or consumption," as section 144.030.2(5) requires. *IBM,* 958 S.W.2d at 557. The

---

**3.** In fact this Court noted in *IBM* that the director conceded "that DST used the machinery and equipment to expand an existing plant." *IBM,* 958 S.W.2d at 557.

director claims that in this case, DST again failed to prove that the equipment and machinery "is used directly in manufacturing ... a product which is intended to be sold ultimately for final use or consumption." Section 144.030.2(5).

But in this case, by contrast, the parties agree there are printed products produced and sold to the ultimate consumer by the use of equipment involved in this exemption request.

■ Contrary to the director's assertion, the equipment and machinery at issue are "used directly in manufacturing." This Court has adopted the "integrated plant doctrine," which views manufacturing operations as "continuous and indivisible." *Concord*, 916 S.W.2d at 191. Though the computers and other equipment at the Winchester facility are not used exclusively for the manufacture of the products in question, they are substantially so used. They also are an integral part in producing the ultimate product. *Id.* at 192. The mainframe computers at Winchester run the software applications that enable the printing of the products to be accomplished. They gather, store and organize all the information about the shareholders from the mutual fund clients. Computer workstations provide the data required for the packages, and then computer applications, which work on the mainframes, decide what material will be placed in the packages and format the shareholder statements. Though the printing and packaging actually is done at the Output Technologies–Support Resources facilities, the DST mainframes are what commands the printing to occur, and give the facilities all the information necessary to create the customized packages of printed materials.

■ The fact that the printing and the gathering occur at different sites does not cause the equipment and machinery to fail to be "used directly in manufacturing." This is because the "integrated plant doctrine" has been expanded to encompass two corporate entities under common ownership, so "long as both businesses work together to manufacture a single product." *Concord*, 916 S.W.2d at 192. That is, the equipment and machinery of the two entities are "integrated and synchronized" for the purpose of manufacturing a product intended to be sold ultimately for final use or consumption. *Id.* This is the case here, as the equipment and machinery at DST's Winchester facility along with that at Output Technologies–Support Resources work together to create the customized packages of print materials for the mutual fund clients.

■ The director also contends that DST does not manufacture "a product which is intended to be sold ultimately for final use or consumption." Section 144.030.2(5). A "sale" requires rendering a taxable service or transferring tangible personal property. *IBM*, 958 S.W.2d at 557; Section 144.010.1(9). Here, unlike in *IBM*, DST has shown that it creates customized packaged printed materials for its mutual fund clients under contract. DST has a fee schedule to charge its clients for each customized package it produces.

The parties agree that the printed materials are subject to sales tax.[4] In fact, Output Technologies–Support Resources has, by agreement with the director of

---

4. Section 144.010.1(10), which defines "sale at retail" provides that the selling of computer printouts or computer output "to a purchaser to enable the purchaser to obtain for his or her own use the desired information" is to be considered the sale of a service and not the sale of tangible personal property. That statutory exception clearly does not apply to the product produced as the end result of the process described in this case.

revenue, a methodology for determining the sales tax due based upon the number of shareholders receiving the product in the state of Missouri. While these Missouri sales amount to only three to five percent of the total of such products, that is not determinative of substantiality. All of the products are subject to sales tax because they are sales at retail. Section 144.010.1(10). But only those products actually delivered in the state of Missouri are sales upon which the tax is collected.[5] From the record, it is evident that the products sold and shipped by DST's related companies, Output Technologies–Support Resources, would not exist without the production facilities of the mainframe computers at the Winchester facilities and the related facilities and equipment.

■ The commission notes that DST also argues that some of its claimed exemption is for replacement, under section 144.030.2(4), which provides an exemption for replacement machinery and equipment used in manufacturing a product intended to be sold ultimately for final use or consumption. DST did not present this argument in its official protest payment affidavit, Data Switch did not present this argument in its refund claim as required by section 144.190.3, and the argument is not raised in complaints before the commission. The commission is barred from considering such arguments. However, as the commission notes, DST presented no evidence that any of the equipment that is the subject of this exemption claim was replacement.

The director asserts that DST failed to carry its burden of establishing the exemption because its evidence was in the form of summaries that listed, by categories, the equipment and other items upon which the exemption was claimed. However, the underlying documents, upon which the summaries apparently are based, are in the record. Because the commission decided this case on the basis that DST had failed to establish, under section 144.030.2(5) that the products were "intended to be sold ultimately for final use or consumption," the commission may not specifically have ascertained that all of the items in the summary lists were "used directly in manufacturing." Moreover, it is unclear whether any of the equipment for which the exemption is claimed was replacement equipment, which, as noted above, cannot be considered part of this case. In these circumstances, it is appropriate to remand the case to the commission to review the evidence to ascertain that the items that are the subject of the exemption claim met the statutory criteria of section 144.030.2(5).

Reversed and remanded.

PRICE, C.J., LIMBAUGH, WHITE, HOLSTEIN and BENTON, JJ., concur.

LAURA DENVIR STITH, J., not participating.

5. Since the periods in controversy in this case, the director promulgated a regulation which purports to apportion the exemption by identifying the equipment that is devoted to the exempt activities. 12 C.S.R. 10–111. At the time the claims in question here arose, however, there was no such regulation. Our only guidance, then, is the words of the statute. The statute itself does not require that all of the capacity of this plant be used in the manufacture of products for sale to the ultimate consumer, and thus does not seem to preclude an apportionment scheme. Neither party has briefed the question in this case, and no opinion is expressed as to the validity of the approach set forth in the recent regulation.