**EMERSON ELECTRIC CO., Appellant,**

v.

**DIRECTOR OF REVENUE,**
Respondent.

**No. SC 87146.**

Supreme Court of Missouri,
En Banc.

Nov. 7, 2006.

have committed a crime or violation of sec-    tion 311.325, RSMo....").

Brenda L. Talent, Ann K. Covington, Susana J. Coronado, St. Louis, Edward F. Downey, Carole L. Iles, Jefferson City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Alana M. Barragan-Scott, Asst. Atty. Gen., James L. Dpradlin, Jefferson City, for Respondent.

RONNIE L. WHITE, Judge.

## I. Introduction

Emerson Electric Co. challenged the Director of Revenue's assessment of use tax paid on machinery used to design, prototype, and test new motors. The Administrative Hearing Commission (AHC) ruled that the assessment was proper and denied Emerson a refund. Emerson seeks review of the AHC's decision. The parties' central issue is whether the equipment is "used directly in manufacturing" to qualify for the sales/use tax exemption as contemplated in section 144.030.2(5).[1] The Court declines to extend the integrated plant doctrine to these preliminary stages of production. The decision of the AHC is affirmed.

## II. Facts and Procedural History

Emerson filed claims for refunds of use tax remitted on three machines purchased between 1994 and 1998. The AHC consolidated the cases, conducted a hearing on all three, and made the following findings of fact.

*Emerson's Motor Technology Center*

Emerson is a Missouri corporation engaged in the business of manufacturing electric motors. Its corporate headquarters in St. Louis consists of several buildings, among them the motor technology center (MTC), which is one of three advanced technology centers comprising a research and development network for the company's global operations. The MTC is a state-of-the-art research and development facility and home to Emerson's engineering group. It supports Emerson's affiliates and divisions and their customers in developing advanced motors and electronic controls. The three machines in question are located in the MTC.

The MTC occasionally undertakes co-development projects where Emerson and a customer work together, pursuant to a written "development agreement," to create a specific product. Co-development often requires considerable sampling and testing. Once the final sample is approved, the MTC engineers send the design and material specifications to the manufacturing plants to build the motors. The MTC also designs platforms, which are generic motors for general application. Emerson uses the same process of making

---

1. All references are to RSMo 2000.

sample motors for co-development projects that it uses for its own products.

The MTC also provides support to U.S. Electrical Motors, which is an Emerson division that supplies standard platform motors that customers can purchase from its catalogue. The MTC assists Emerson and customers with modification projects when customers request minor changes to standard motors. In this context, the MTC engineers use the CAD system to design the custom-modified motors and send the designs to the plants to build them.

The majority of the MTC's work involves engineering support for plants and their customers. Co-development represents about 30% and the remainder consists of innovation and platform design.

*The Equipment*

The CAD system enables engineers to produce three-dimensional designs-a blueprint in 3–D. Prior to its purchase of the 3–D CAD system for which it claims a tax exemption in this case, Emerson used a two-dimension CAD system. There is no indication in the record that Emerson claimed a refund for the 2–D system or any other low-tech predecessors previously used to create blueprint drawings. Emerson's internal documents state that the driving forces behind the acquisition of the CAD system were the acceleration of new product development, improvement of engineering and product quality, and increased engineering productivity. The CAD equipment is used 70% of the time for custom modification projects, 20% for developing platform designs, and 10% for co-development projects.

The stereolithography machine is a tool for developing mechanical parts. It reads design specifications transferred electronically from the CAD system and uses a laser and liquid polymer to make three-dimensional molded plastic sample parts. The sample parts can be used for fitting (i.e., to see if the part fits into an appliance) or for mechanical testing. These samples are not strong enough for performance testing or use in a real machine, and they are not sold to customers. Emerson's internal documents state that the stereolithography machine was purchased to provide research and development (R & D) services to various Emerson divisions, to increase the production of sample parts, to provide rapid prototyping technology to the divisions, and to ultimately increase engineering productivity. These internal documents also state that the machines would allow inexpensive experimentation of new part designs and manufacturing processes. Approximately 50 to 75% of co-development projects involve parts developed using this machine.

The dynamometer is used to test motors for compliance with industry and customer standards regarding horsepower, efficiency, speed, and torque. It tests samples for development purposes as well as real motors for quality control. This particular machine can also calibrate other dynamometers used in Emerson's manufacturing plants. Its accuracy enables engineers to test and evaluate new design solutions and improvements in manufacturing processes. Emerson's internal documents state that the dynamometer was purchased to provide a testing facility to certify compliance with industry guidelines, permit engineers to conduct accurate developmental tests, and provide future motor designs. The dynamometer is used approximately 15% of the time for modifying existing platform motors.

The director conducted an audit and concluded that the MTC is an R & D facility that is not engaged in manufacturing. After hearing, the AHC concluded that the three machines were purchased and used for engineering design, prototyping, and sample testing, which are R & D functions distinguishable from manufactur-

ing within the meaning of section 144.030.2(5). As such, the director's assessment was proper.

### III. Jurisdiction and Standard of Review

This Court has jurisdiction pursuant to Mo. Const. art. V, section 3 and reviews *de novo* the AHC's interpretation of revenue law.[2] The AHC's factual determinations are upheld if they are supported by the law and, after reviewing the whole record, there is substantial evidence to support them.[3] A taxpayer bears the burden of showing they are entitled to an exemption.[4] Exemptions from taxation are to be strictly construed against the taxpayer, and any doubt is resolved in favor of application of the tax.[5]

### IV. Applicable Law

Section 144.030.2(5) provides sales and use tax exemption for:

*Machinery and equipment,* and the materials and supplies solely required for the installation or construction of such machinery and equipment, *purchased and used to establish new or to expand existing manufacturing, mining or fabricating plants in the state if* such machinery and equipment is *used directly in manufacturing,* mining or fabricating *a product which is intended to be sold ultimately for final use* or consumption.[6]

This Court first considered the scope of this exemption in *Floyd Charcoal Co. v. Director of Revenue,*[7] where it adopted the "integrated plant doctrine" for determining what is "directly used" in manufacturing. "The basic questions are the following: (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt *machinery to make an integrated and synchronized system?"* [8] In *Floyd,* we concluded that a system of conveyors and storage bins that removed starch from railroad cars and conveyed it to a processing area was "used directly in manufacturing."

This Court also applied the integrated plant theory in *Noranda Aluminum, Inc. v. Missouri Department of Revenue.*[9] There, machines used to produce anodes, which in turn were used on an aluminum production line, were "essential to and comprise an integral part of Noranda's manufacturing process." [10] In addition, laboratory equipment used to test the aluminum for impurities was "essential to and a part of the manufacturing process." [11]

In *Concord Publishing House, Inc. v. Director of Revenue,*[12] this Court concluded that computer equipment used by journalists and editors to compose and format newspaper content was "directly used" to

2. *Concord Pub. House, Inc. v. Director of Revenue,* 916 S.W.2d 186, 189 (Mo. banc 1996).

3. *DST Systems, Inc. v. Director of Revenue,* 43 S.W.3d 799, 800 (Mo. banc 2001); section 621.193.

4. *Branson Props. USA, L.P. v. Dir. of Revenue,* 110 S.W.3d 824, 825 (Mo. banc 2003).

5. *Id.*

6. Section 144.030.2(5) (emphasis added).

7. 599 S.W.2d 173 (Mo.1980).

8. *Id.* at 177 (quoting *Niagara Mohawk Power Corp. v. Wanamaker,* 286 A.D. 446, 144 N.Y.S.2d 458, 461–462 (N.Y.App.Div.1955), *aff'd,* 2 N.Y.2d 764, 157 N.Y.S.2d 972, 139 N.E.2d 150 (1956)).

9. 599 S.W.2d 1 (Mo.1980).

10. *Id* at 4.

11. *Id.*

12. 916 S.W.2d 186 (Mo. banc 1996).

manufacture the newspaper. Similarly, in *DST Systems v. Director of Revenue*,[13] the Court allowed the exemption for computer equipment used to process and store financial information and produce printed reports for consumers.

In *Concord Publishing, DST Systems,* and more recently in *Southwestern Bell Telephone Company v. Director of Revenue*,[14] the Court clarified that the physical distance between disputed equipment and exempt equipment was not determinative.

## V. Discussion

Emerson asserts that the AHC erred in ruling that the CAD system, stereolithography machine, and dynamometer are not exempt under section 144.030.2(5). Both parties focus primarily on the second part of the statute regarding what constitutes "direct use in manufacturing." However, Emerson's failure to establish the key element of the first part of the statute, largely overlooked by the parties but central to its legislative purpose, is at least equally sufficient to affirm.

*Are the disputed machines directly used in manufacturing the product intended for sale?*

■ First, Emerson contends that the machines were used directly in manufacturing a product intended for sale in that Emerson used the machines for designing, prototyping, and testing, and such activities are essential and integral parts of the manufacturing process.

The parties agree that the functions of the disputed machines are design and development. They disagree, however, as to whether these functions are part of the manufacturing process. The director asserts, and the AHC held, that design and development—though necessary to produc-

tion—are separate from and preliminary to manufacturing.

None of this Court's precedent supports Emerson's position that design and development are integral parts of manufacturing. Emerson claims that the machines are exempt under the integrated plant doctrine. The Court disagrees. Applying the three prongs of *Floyd,* first, design and development equipment is necessary to production. Second, regarding the physical and causal proximity of the equipment to the finished product, they are distant. The physical distance between the equipment and the actual manufacturing plants is not fatal alone but compounds the problem when coupled with stretched causality. While there is close causality between the disputed equipment and the initial designs, prototypes, and test results that they generate, the distance between this equipment and the finished product off the assembly line—a real motor for retail sale—is much farther removed. Again, design and development are necessary to production, but they are "upstream" stages separate and distinct from "downstream" manufacturing. This distinction becomes sharply apparent when applying the third prong. The disputed items do not operate "harmoniously" with exempt machinery but rather they perform the "prelude." The disputed equipment does not operate with the exempt machines in a "synchronized" system; the operations of the former must precede the work of the latter.

In *Mid–America Dairymen, Inc. v. Payne,* the court of appeals considered whether a product development facility separate from and supportive to other facilities is "directly engaged in ... manufacturing ..."[15] There, the court acknowledged the integrated plant analysis of *Floyd* and concluded that the separate fa-

**13.** 43 S.W.3d 799 (Mo. banc 2001).

**14.** 182 S.W.3d 226 (Mo. banc.2005).

**15.** 990 S.W.2d 648 (Mo.App.1999).

cility was not "used for ... manufacturing" and, therefore, did not qualify for the claimed tax treatment. Though that case involved a VAT abatement under a different statute, the court's reasoning is instructive for purposes of distinguishing product development from manufacturing.

In *Concord Publishing* and *DST Systems*, where the disputed computers were used to compile, process, and edit information contained in newspapers and reports printed and sent to customers, the information itself was the ultimate product. The product being manufactured contained the information. Here, conversely, the information generated by Emerson's design equipment is not the finished product. Emerson is not selling the blueprints, samples, or test results generated by the CAD, stereolithograph, or dynamometer. The product intended for sale is the motor. Moreover, in *Concord Publishing* this Court expressly limited its holding to computers used for newspaper publication.[16]

Emerson describes its co-development and customization projects in great detail and asserts that its development of custom products for specific buyers is not research and development in the general, experimental sense, but rather an integral part of manufacturing. Customization is not

relevant to the analysis. Application of *Floyd* in this context yields the same result. Design and development is preliminary to manufacturing, not part of it. Therefore, Emerson's claim fails without regard to the percentage of use of the equipment for custom projects or the certainty of the sale of the ultimate product.

In sum, to the extent the equipment was used for design, prototyping, and developmental testing, the equipment is not used directly in manufacturing the product intended for sale.

■ The mixed use of the dynamometer merits further discussion. The AHC found that Emerson used this machine primarily for R & D, but also 15% of the time on existing platform motors plus an unquantified but "incidental" amount of time for testing actual motors and calibrating dynamometers from the plants. In *Noranda*, an exemption for laboratory machines used to test molten aluminum samples [17] was allowed in order to monitor quality control during the manufacturing process. Moreover, the director's own regulations suggest that Emerson's partial use of the machines for testing existing motors and dynamometers would normally qualify the machine for exemption.[18] The appropriations request on which the AHC

---

16. *Concord Publishing* at 196.

17. Unlike the prototype samples created by Emerson's stereolithograph, the aluminum samples in *Noranda* were pulled directly from the production line and were incorporated into the final product. The equivalent in Emerson's process would be when it randomly pulls real motors from its production line for quality control testing.

18. Though not in effect when Emerson purchased the dynamometer, the Director's regulations are nonetheless instructive. 12 CSR 10–111.010(4)(F) provides the following examples:

A manufacturing company purchases various pieces of testing equipment for different purposes, including: i) to ensure that the

seller's product meets the tolerances claimed in its marketing literature, ii) to meet the customer's specification requirements mandated by the sales agreement, and iii) to perform research, and development on potential future products. The testing equipment for the first two (2) situations are directly used to manufacture a product intended to be sold ultimately for final use or consumption and would qualify for the exemption. The testing equipment for research and development is not directly used in manufacturing a product intended to be sold ultimately at retail and, therefore, would not qualify for the exemption. In addition, 12 CSR 10–111.010(3)(F) states in pertinent part:

In order for the machinery and equipment to be exempt from tax it need not be used

relied cited three objectives: to provide a testing facility that would be able to certify a motor's compliance with industry guidelines, to permit engineers to conduct accurate developmental tests, and to improve the efficiency of future motor designs. While the second and third objectives are non-exempt R & D functions, the first objective, as described in detail in the appropriations request, relates to direct testing of existing motors. But even if this Court disagrees with the AHC about Emerson's intent to use the machine, at least in part, for testing that would be considered part of the manufacturing process under the aforementioned regulations, Emerson still cannot claim the exemption because it failed to prove that the machine was purchased and used to expand manufacturing plants in Missouri.

*Were the machines purchased and used to expand Emerson's manufacturing plant(s) in the state?*

■ In its second point, Emerson asserts that the AHC erred in denying the exemption because the machines were purchased and used to expand Emerson's manufacturing plant, of which it claims the MTC is a part, and increase Emerson's production.

In *Concord Publishing*, Concord's computers expanded its existing manufacturing in that they enabled the paper to increase its publication from six days of the week to seven. Here, the CAD system and stereolithograph allow Emerson to improve designs and produce more samples, but, again, the blueprints and samples are not for sale. While the record shows that the disputed equipment increased engineering productivity and the production of more sample parts, it does not show an increase in production of saleable motors coming off assembly lines in the state.[19] As already discussed, design and development are not "manufacturing." An increase in Emerson's R & D capabilities at the MTC is not itself plant expansion. The MTC is not an integral part of Emerson's actual manufacturing plants in the state. This Court finds no evidence suggesting that the equipment acquired to expand R & D at the MTC resulted in an expansion of Emerson's manufacturing plants in Missouri.

As such, the CAD system and stereolithography machine clearly do not qualify for the exemption. Further, as already noted, even if the AHC had found an intended and material use of the dynamometer for testing actual motors as part of the manufacturing process, Emerson failed to prove any intended or actual manufacturing plant expansion in Missouri. The dynamometer does not qualify for the exemption.

## VI. Conclusion

The decision of the AHC is affirmed.

WOLFF, C.J., LAURA DENVIR STITH, LIMBAUGH and RUSSELL, JJ., concur; BLACKMAR, Sr.J., dissents in separate opinion filed; TEITELMAN, J., concurs in opinion of BLACKMAR, Sr.J. PRICE, J., not participating.

CHARLES B. BLACKMAR, Senior Judge.

The principal opinion follows the lead of the Director of Revenue and the Adminis-

---

exclusively or primarily for an exempt purpose. The purchaser must intend at the time of purchase to use and actually make material use of the machinery and equipment in an exempt capacity to qualify. The fact that it may also be used for nonexempt purposes will not prevent the purchase of the item from qualifying for the exemption.

19. During most of the tax years in question, Emerson had manufacturing plants in Ava and Kennett, Missouri. The Ava plant closed in 1997.

trative Hearing Commission in reading the manufacturing exemption for sales tax (sec.144.010(8), RSMo 2000, made applicable to the use tax by sec. l44.030) too narrowly. The Court reiterates the familiar maxim that exemptions from taxation are to be construed strictly against the taxpayer. *See* e.g. *Trailiner Corp. v. Director of Revenue*, 783 S.W.2d 917, 920 (Mo. banc 1990). Of equal standing, however, is the principle that a statute should be applied in a manner consistent with its evident purpose, which this Court has consistently applied in developing the "integrated plant" concept in construing the manufacturing exemption to the sales tax statute. *See Floyd Charcoal Company, Inc. v. Director of Revenue*, 599 S.W.2d 173, (Mo.1980); *Noranda Aluminum, Inc.*, 599 S.W.2d 1, (Mo.1980); *Concord Publishing House, Inc. v. Director of Revenue*, 916 S.W.2d 186, (Mo. banc 1996); *DST Systems, Inc.*, 43 S.W.3d 799, (Mo. banc 2001); *Southwestern Bell Telephone Company v. Director of Revenue*, 182 S.W.3d 226 (Mo. banc 2005).

I believe that the result reached in the principal opinion is inconsistent with the rule consistently developed in the cases just cited and, therefore, respectfully dissent. It is appropriate to observe at this point that the operations here in issue seem to be more sophisticated and more widely spread than those discussed in the cited cases, but this should not make a difference in principle.

Emerson Electric Co. is a Missouri corporation whose manufacturing operations for electric motors and other products are carried on in numerous facilities, some located in Missouri, some in other states, and some in foreign countries. This case involves three machines useful in the production of electric motors. The machines are housed in Emerson's Motor Technology Center (MTC), a large building situated on the campus of the company's St. Louis headquarters. The machines at issue are: (1) a modeling tool for the Computer Assisted Design (CAD) system, acquired in 1995 to upgrade an existing device by allowing the production of three-dimensional drawings as a guide for the manufacture of motors; (2) a stereolithography machine to create plastic parts for use in mechanical testing of motors, as, for example, to determine whether a newly designed part meshes properly with the machine it is intended for; and (3) the dynamometer, a machine for testing performance of motors, for calibrating production equipment, and for determining compliance with federal standards.

Although motors for sale to Emerson's customers are not produced at the MTC, all three of the machines here in issue perform essential functions in the manufacture of motors. The three-dimensional drawings generated by the CAD system are transmitted electronically to the company's manufacturing plants to guide production operations. Specimen parts generated by the stereolithography machine may be used to make molds for the production of the parts used in motors produced for customers. The dynamometer is used to test motors to make sure that they meet governmental and industry standards, and motors may be sent from other plants to the MTC for testing. It is patent that the three machines are essential to, and an integral part of, the company's manufacturing operation. The machines, then, were purchased and used to expand an existing manufacturing plant in the state of Missouri. The MTC is a manufacturing plant because necessary steps in the production of motors offered for sale to customers are performed there. This so even though the motors offered for sale to customers actually roll off the line at other locations. The exemption is not lost, moreover, if the machines in issue are used for other purposes that may not meet the

test of manufacturing. *See D.S.T.* at p. 803.

The principal opinion concedes that "the physical distance between the equipment and the actual manufacturing plants is not [a controlling circumstance.]" The opinion, nevertheless, draws a distinction between "upstream" design and development and "downstream" manufacturing. While agreeing that design and development are "necessary to production," the opinion accepts the Director's position that these processes are "separate from and preliminary to manufacturing." Such a parochial holding is not justified either by the language or by the purpose of the statutory exemption. It finds no support in this Court's consistent holdings, cited above.

By use of the new machines productivity is increased, waste minimized, and previously unavailable in-house certification of compliance with standards made available. The company has a superior plant, which may enable it to produce more and cheaper motors. It may reasonably be inferred that increased production will require the hiring of additional employees at the MTC, and also elsewhere. Manufacturing is a continuing process, in which the machines in the MTC are integral parts. The test of expanding existing manufacturing plants in Missouri is clearly met.

This Court has recognized economic realities in adopting the integrated plant doctrine. The sole purpose of the operations involved in this case is to facilitate the manufacture of motors. The design, perfection and testing of the product are essential parts of the manufacturing process. This is especially so as to motors produced in cooperation with the customers in the co-development process and customized motors in which the customer makes its special needs known. These processes make up a substantial segment of the production of the MTC. In both, the customer is involved from the beginning.

There is no designing and development in the abstract, in the hope that a new and useful product will evolve. There is, rather, a continuum from the drawing board to the assembly line.

The integrated plant doctrine, previously recognized by this Court, manifestly applies. Cases from other jurisdictions, adduced by the Director, may involve different statutory language and varying circumstances. They are not persuasive in the face of the strong and consistent trend of this Court's holdings. Detailed analysis is neither necessary nor helpful.

The purpose of the statutory exemption is to encourage and promote the construction of new manufacturing facilities by relieving the manufacturer of burdensome taxation. By the operation of normal economic factors the prices charged to customers may be lowered, increased sales generated, and employment increased.

The decision of the Administrative Hearing Commission should be reversed and the case remanded to the Commission with directions to grant the relief sought by Emerson.