

# SUPREME COURT OF MISSOURI
## en banc

CHARTER COMMUNICATIONS )         *Opinion issued April 18, 2023*
ENTERTAINMENT I, LLC, )
                                 )
          Respondent, )
v.                               )         No. SC99517
                                 )
DIRECTOR OF REVENUE, )
                                 )
          Appellant. )

PETITION FOR REVIEW OF A DECISION OF THE
ADMINISTRATIVE HEARING COMMISSION
The Honorable Renee T. Slusher, Commissioner

The director of the department of revenue appeals the decision of the administrative hearing commission (AHC) finding Charter Communications Entertainment I, LLC, (CCE I) is entitled to manufacturing exemptions with respect to the use tax it paid on replacement equipment purchased in 2011 and 2012. The director claims the AHC erred in concluding CCE I's provision of telecommunications services qualifies as manufacturing for purposes of the manufacturing sales and use tax exemptions in sections 144.030.2(4) and 144.054.2.[1]   The director also claims CCE I failed to show its

---

[1] Citations to section 144.030.2(4) are to RSMo Supp. 2010. Although section 144.030.2(4) was amended in both 2011 and 2012, the relevant language did not change, so this opinion refers only to RSMo Supp. 2010 for ease of reference. Citations to section 144.054.2 are to RSMo Supp. 2009, unless otherwise noted.

telecommunications replacement equipment is "used directly" in manufacturing as required under section 144.030.2(4) because it did not establish the equipment is substantially so used.

The Court finds equipment used to provide telecommunications service is equipment used in "manufacturing" under sections 144.030.2(4) and 144.054.2 and CCE I established its replacement equipment is "used directly" in manufacturing telecommunications services. Therefore, the AHC's decision was authorized by law and is hereby affirmed.

**Factual and Procedural Background**

CCE I is one of several entities affiliated under the corporate umbrella of Charter Communications, Inc., which collectively operate under the name Charter. Charter and its affiliates provide telecommunications, internet, and cable services nationwide through a shared infrastructure known as the Charter network. CCE I owns and operates Charter's network in Missouri, and another affiliate, Charter Fiberlink-Missouri, LLC, uses the Charter network, including the equipment owned by CCE I, to provide Missouri customers telecommunications, internet, and cable services. To provide telecommunications service to Charter customers, CCE I's various pieces of equipment work together in a coordinated and synchronized fashion to transform the sound waves of a human voice into electronic signals. The equipment then transforms those signals through several different processes for transmission across various stages of Charter's network infrastructure until finally reproducing a caller's voice through sound waves emitted from a recipient's handset.

2

In 2011 and 2012, CCE I purchased from Cisco Systems, Inc., and paid use tax on, replacement equipment for use in the Charter network located in Missouri, without which Charter customers cannot make or receive telephone calls. In 2014 and 2015, Cisco assigned to CCE I the right to pursue use tax refunds for the 2011 and 2012 purchases of replacement equipment. In February 2014, CCE I submitted a claim to the director of the department of revenue for a refund of $693,635.05 for use taxes paid on the equipment purchased in 2011. It submitted a second claim in 2015 for a refund of $890,971.09 for the use taxes paid on the equipment purchased in 2012. In both refund claims, CCE I asserted it was entitled to the sales and use tax exemptions provided in sections 144.030.2(4) and 144.054.2. After the director denied the refund requests, CCE I filed complaints appealing the director's decisions to the AHC, and the AHC consolidated the proceedings for decision.

The AHC held a hearing on CCE I's consolidated first amended complaint. In its decision after the hearing, the AHC determined CCE I was "entitled to manufacturing exemptions on the use tax it paid on telecommunications replacement equipment in the amount of $1,495,652.30, plus statutory interest." In support of that conclusion, the AHC found CCE I's provision of telecommunications service constitutes "manufacturing," under sections 144.030.2(4) and 144.054.2, and CCE I's replacement equipment is "used directly" in manufacturing such service. The director filed a petition for review of the AHC's decision, pursuant to section 621.189. This Court has jurisdiction because the case involves "the construction of the revenue laws of this state." Mo. Const. art. V, sec. 3.

3

**Standard of Review**

This Court will affirm the AHC's decision if: (1) it is authorized by law; (2) it is supported by competent and substantial evidence upon the whole record; (3) mandatory procedural safeguards are not violated; and (4) it is not clearly contrary to the General Assembly's reasonable expectations. Section 621.193, RSMo 2016. "[T]his Court reviews *de novo* all questions of statutory interpretation raised in an AHC decision." *AAA Laundry & Linen Supply Co. v. Dir. of Revenue*, 425 S.W.3d 126, 128 (Mo. banc 2014). The "Court is not bound by the AHC's interpretation and application of the law." *Carfax, Inc. v. Dir. of Revenue*, 653 S.W.3d 415, 418 (Mo. banc 2022) (alteration omitted).

Statutes creating tax exemptions "must be strictly, but reasonably, construed against the party claiming the exemption." *Beyond Housing, Inc. v. Dir. of Revenue*, 653 S.W.3d 400, 406 (Mo. banc 2022) (internal quotation omitted). In determining a statute's meaning, this Court's primary goal is to ascertain and give effect to the legislature's intent, as evidenced by the plain and ordinary meaning of the words used. *Id.*

**Equipment Used in Manufacturing**

The director first claims the AHC misapplied the law when it determined the provision of telecommunications service is "manufacturing" under sections 144.030.2(4) and 144.054.2. Specifically, the director claims the AHC erred when it retroactively applied the 2018 versions of sections 144.030.2(4) and 144.054.2 that expressly define "manufacturing" to include telecommunications services. It argues versions of the statutes in effect at the time of the purchases of the replacement equipment govern, and the plain and ordinary meaning of "manufacturing" in the statutes at that time does not include the

4

provision of telecommunications services, citing this Court's holdings in *IBM Corp. v. Director of Revenue*¸ 491 S.W.3d 535 (Mo. banc 2016).  In support of the AHC's decision, Charter argues its purchase of replacement equipment satisfies the requirements of the exemptions regardless of whether the 2018 amendments are applied and the Court's decision in *IBM* is not controlling.

When CCE I purchased the replacement equipment in 2011 and 2012, section 144.030.2(4) provided a sales and use tax exemption for:  "Replacement machinery . . . used directly in manufacturing . . . or producing a product which is intended to be sold ultimately for final use or consumption[.]"  The phrase "product which is intended to be sold ultimately for final use or consumption" was statutorily defined to include "any service that is subject to state or local sales or use taxes."   Section 144.010.1(14).[2] Telecommunications service was subject to state or local sales or use taxes, pursuant to section 144.020.1(4), RSMo Supp. 2011.  Section 144.054.2 also exempted certain other purchases from sales taxes, including equipment "used or consumed in the manufacturing, processing, compounding, mining, or producing of any product[.]"  Consequently, even though the two exemptions are different, they both require that the taxpayer establish the equipment is used in "manufacturing." *See Carfax*, 653 S.W.3d at 418.

---

[2] Section 144.010.1(14), RSMo Supp. 2005, was amended during the purchase period.  The amendment did not change the relevant language, but it moved the definition to subdivision (15).  Section 144.010.1(15), RSMo Supp. 2011.  It has since been moved to subdivision (9).  Section 144.010.1(9), RSMo Supp. 2022.  For clarity and because the language of the subdivision has not changed, this opinion references section 144.010.1(14), unless otherwise noted.

For purposes of the sales and use tax exemptions, "'manufacturing' encompasses only activities that transform an input into an output with a separate and distinct use, identity, or value from the original." *Id.* (internal quotation omitted). Applying that definition to the facts found by the AHC, the provision of telecommunication service begins "with a handset that converts the sound waves of a human voice into electrical impulses that are transmitted into an [adapter] that is located in a customer's home." The adapter "converts the electrical signals into voice packets, places the voice packets into an Ethernet format, and then turns them into radio signals (RF signal), converting the voice and encapsulating the pitch and sound." The signals are then amplified, converted, and transmitted using various items of CCE I's replacement equipment. When the call is answered, the signal moves downstream, "and the reverse process occurs until the voice is converted by the recipient's handset into a reproduction of the caller's voice that the recipient can hear." That process qualifies as "manufacturing" because it transforms an input (the caller's voice) into an output with a separate and distinct value from the original – a complete reproduction of the caller's voice "with new value to a listener who could not otherwise hear or understand it." *Sw. Bell Tel. Co. v. Dir. of Revenue*, 78 S.W.3d 763, 768 (Mo. banc 2002) [hereinafter *Bell I*], *overruled on other grounds by IBM*, 491 S.W.3d at 541. Therefore, the Court holds CCE I established its replacement equipment is used in "manufacturing" because it is used to transform an input into an output with a separate and distinct value from the original.

The director argues the Court should reach the opposite conclusion because it held in *IBM*:

> To the extent cases such as *Bell I* and [*Southwestern Telephone Co. v. Director of Revenue*, 182 S.W.3d 226 (Mo. banc 2005) [hereinafter *Bell II*]] suggest that an expansive interpretation of the word "manufacturing" is authorized by the "manufacturing" exemption, and *to the extent that they hold that the electronic **transfer** of voices is itself manufacturing as that term is used in the exemption, they are no longer to be followed*.

491 S.W.3d at 541 (emphasis added). CCE I counters that the General Assembly abrogated *IBM* when it amended section 144.030.2(4) in 2018;[3] consequently, *IBM* does not control.

CCE I is correct that the Court's holding in *IBM* does not control, but that conclusion is not dependent on the 2018 statute's abrogation of *IBM*'s construction of exemptions that are inconsistent with the 2018 statutory provisions and the holdings of *Bell I* and *Bell II*. In *IBM*, the director claimed the AHC erred in determining IBM's sale of computer hardware and software to MasterCard was exempt from use tax based on what it argued

---

[3] Section 144.030.2(4), as amended in 2018, provides:

> For the purposes of this subdivision, subdivision (5) of this subsection, and section 144.054, as well as the definition in subdivision (9) of subsection 1 of section 144.010, the term **"product"** includes telecommunications services and the term **"manufacturing"** shall include the production, or production and transmission, of telecommunications services. The preceding sentence does not make a substantive change in the law and is intended to clarify that the term **"manufacturing"** has included and continues to include the production and transmission of "telecommunications services", as enacted in this subdivision and subdivision (5) of this subsection, as well as the definition in subdivision (9) of subsection 1 of section 144.010. The preceding two sentences reaffirm legislative intent consistent with the interpretation of this subdivision and subdivision (5) of this subsection in [*Bell I*] and [*Bell II*], and accordingly abrogates the Missouri supreme court's interpretation of those exemptions in IBM Corporation v. Director of Revenue, 491 S.W.3d 535 (Mo. banc 2016) to the extent inconsistent with this section and [*Bell I*] and [*Bell II*]. The construction and application of this subdivision as expressed by the Missouri supreme court in DST Systems, Inc. v. Director of Revenue, 43 S.W.3d 799 (Mo. banc 2001); [*Bell I*]; and [*Bell II*], is hereby affirmed.

was the Court's broad construction of "manufacturing" in *Bell II* in its holding "the transmission of a voice over telephone lines qualified as 'manufacturing.'" *IBM*, 491 S.W.3d at 537-38. The Court correctly rejected IBM's argument that *Bell I* and *Bell II* support a broad construction of the term "manufacturing" because such construction is precluded by the governing principle that tax exemptions are strictly construed against the taxpayer. *Id.* at 538. The Court's ruling in *IBM* was that MasterCard's computers do not "manufacture" a tangible or intangible product because they merely "receive information, analyze and make determinations based on this information, and relay these determinations to their customers." *Id.* at 540. Its ruling distinguished between "transformation of a product and mere transmission of information." *Id.*

The director relies on *IBM*'s statement that, to the extent that *Bell I* and *Bell* II "hold that the electronic transfer of voices is itself manufacturing as that term is used in the exemption, they are no longer to be followed." *Id.* at 541. Because the issue in *IBM* was whether "the transmission and analysis of credit card data" was "manufacturing" and the statement regarding whether the electronic transfer of voices qualified as "manufacturing" was not necessary to the decisions of the case, the statement was *obiter dictum* and not binding. "Judicial decisions must be construed with reference to the facts and issues of the particular case, and . . . the authority of the decision as a precedent is limited to those points of law which are raised by the record, considered by the court, and necessary to a decision." *Byrne & Jones Enters., Inc. v. Monroe City R-1 Sch. Dist.*, 493 S.W.3d 847, 855 (Mo. banc 2016). Additionally, *IBM*'s characterization of telecommunications services as merely

8

"the transfer of voices itself" is a misstatement of the nature of telecommunications services that was at issue in *Bell I, Bell II*, and this case.

As the AHC found, here, Charter's telecommunications process involves more than the electronic *transfer* of voices. Charter's telecommunications equipment is used to *transform* the caller's voice many times across several different stages of the Charter network until eventually transforming it into a complete reproduction of the caller's voice at the receiver's handset "with new value to a listener who could not otherwise hear or understand it." *Bell I*, 78 S.W.3d at 768.[4]

Moreover, *Bell I* and *Bell II* applied the 1992 versions of sections 144.030.2(4) and 144.010.1(14) and, at that time, taxable services were not included in the definition of the phrase "product which is intended to be sold ultimately for final use or consumption." That changed in 1999, when the General Assembly defined that phrase to include taxable services, such as telecommunications services. Section 144.010.1(14), RSMo. Supp. 1999. Therefore, *Bell I*'s and *Bell II*'s interpretations of the 1992 manufacturing exemption were not concerned with the version of sections 144.030.2(4) and 144.010.1(14) in effect in 2011 and 2012, which included telecommunications service within the relevant definition of the

---

[4] For purchases made after the effective date of the 2018 amendment to section 144.030.2(4), this distinction is irrelevant in the context of telecommunications service. After the 2018 amendment took effect, section 144.030.2(4) expressly provides "'manufacturing' shall include the production, or *production and transmission*, of telecommunications services " which are defined as "the *transmission* of information by wire, radio, optical cable, coaxial cable, electronic impulses, or other similar means," section 144.010.1(16), RSMo Supp. 2022 (emphasis added).

manufactured product and support finding the provision of telecommunications service constitutes "manufacturing."

Ultimately, the AHC correctly decided CCE I uses its replacement equipment in "manufacturing" for purposes of the sales and use tax exemptions in sections 144.030.2(4) and 144.054.2 because its uses the equipment to transform an input (a caller's voice) into an output (a reproduction of the caller's voice that can be heard and understood by the recipient) with a separate and distinct value from the original.

**"Substantial Use" Not Required**

Alternatively, the director contends the AHC misapplied the law when it found CCE I's replacement equipment is "used directly" in manufacturing for purposes of the manufacturing exemption in section 144.030.2(4). The director claims that, because parts of CCE I's replacement equipment are used for both manufacturing and non-exempt purposes, such as providing internet and cable services, CCE I must establish the mixed-use equipment is "substantially used" in manufacturing telecommunications service.

The AHC rejected the director's argument that section 144.030.2(4) requires a taxpayer to establish its replacement equipment is "substantially" used in manufacturing. It found the language of section 144.030.2(4) does not include the words "substantially used," and the director "offer[ed] no statute or case law to support the viability of a 'substantial use' requirement to be engrafted onto the manufacturing exemption."[5]

---

[5] In the past, the AHC has rendered conflicting decisions with respect to whether a taxpayer must establish mixed-use equipment is "substantially used" in manufacturing. In *Cable of Arkansas Inc. v. Director of Revenue*, No. 13-1629 (Mo. Admin. Hrg. Comm'n May 19, 2019), the AHC rejected the notion that, when an item is used for both exempt

10

The director's claim of AHC error requires this Court to determine whether the requirement in section 144.030.2(4) that replacement equipment be "used directly" in manufacturing requires CCE I to establish the particular items of replacement equipment it uses to manufacture telecommunications service that are also used to provide internet and cable service are "substantially" used for the former. Section 144.030.2(4) requires that replacement equipment be "used directly" in manufacturing. To determine whether equipment or parts are "used directly," this Court applies the "integrated plant doctrine." *Dreyer Elec. Co. v. Dir. of Revenue*, 603 S.W.3d 297, 302 (Mo. banc 2020). In applying the integrated plant doctrine, the Court considers three questions:

> (1) Is the disputed item necessary to production? (2) How close, physically and causally, is the disputed item to the finished product? (3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated and synchronized system?

*Id.* The director concedes the words "substantially used" do not appear in the manufacturing exemptions nor the requirements of the integrated plant doctrine. Nonetheless, the director argues this Court, in *DST Systems, Inc. v. Director of Revenue*, 43 S.W.3d 799, 803 (Mo. banc 2001), imposed a "substantial use" requirement. The Court's holding in *DST* does not support the director's argument.

In *DST*, the Court decided whether computers and other equipment purchased by DST, but used by a different company to manufacture products at a different location, were

---

manufacturing purposes and non-exempt purposes, the taxpayer must establish the item is substantially used for manufacturing to be entitled to a manufacturing exemption. In a later decision, however, the AHC held the opposite. *Carfax, Inc. v. Dir. of Revenue*, (Mo. Admin. Hrg. Comm'n Sept. 30, 2021) ("As discussed in *DST*, equipment does not have to be exclusively used in the manufacturing process, but must be substantially used.").

"used directly" to manufacture products "intended to be sold ultimately for final use or consumption" under section 144.030.2(4). *Id.* at 803. In finding the equipment and machinery were "used directly in manufacturing," the court applied "the 'integrated plant doctrine,' which views manufacturing operations as 'continuous and indivisible.'" *Id.* The Court then discussed the facts of the case relevant to application of the doctrine. *Id.* In so doing, the Court stated, "Though the computers and other equipment at the Winchester facility are not used exclusively for the manufacture of the products in question, they are substantially so used," and the computers and other equipment "also are an integral part in producing the ultimate product." *Id.*

That the equipment and machinery were substantially used for manufacture of DST's products and an integral part of producing the ultimate product are facts relevant to the three prongs of the integrated plant doctrine – whether the equipment was "necessary to production"; how close the items were, physically and causally, to the finished product; and whether the equipment "operate[d] harmoniously with admittedly exempt machinery to make an integrated and synchronized system." *Dreyer Elec. Co.*, 603 S.W.3d at 302. The use of the phrase "substantially used" in assessing the sufficiency of DST's evidence to meet the integrated plant doctrine does not evidence an intent to impose an additional requirement to prove equipment is "used directly" in manufacturing the taxpayer's product.

The director also claims the Court's decisions following *DST* recognized it created a "substantial use" requirement, citing *Bell II*, 182 S.W.3d at 231, and *Emerson Electric Co. v. Director of Revenue*, 204 S.W.3d 642, 647-48 (Mo. banc 2006). But, in *Bell II*, the Court determined whether the items at issue were "used directly" in manufacturing based

12

on whether they satisfied the integrated plant doctrine, without requiring an additional showing that the items were "substantially used" in manufacturing. *Bell II*, 182 S.W.3d at 234, 236-37. And, in *Emerson*, the Court indicated equipment used both for manufacturing and for non-exempt purposes could qualify for the manufacturing exemption because it was, in fact, used in the manufacturing process, even if only partially so used. 204 S.W.3d at 647-48.

In these cases, the Court recognized the relevant test for determining whether a particular item is "used directly" in manufacturing is the integrated plant doctrine. The decisions do not impose an additional requirement that equipment be "substantially used" in manufacturing to qualify for the exemption in section 144.030.2(4). Here, the AHC found all CCE I's replacement equipment is used to provide telecommunications service, which the director does not dispute, and the director does not challenge the AHC's conclusion that all the equipment satisfies the integrated plant doctrine. Therefore, the AHC correctly determined CCE I established its replacement equipment was "used directly" in manufacturing telecommunications service.

## Conclusion

The AHC did not err in finding CCE I's provision of telecommunications service qualifies as "manufacturing" for purposes of the sales and use tax exemptions in sections 144.030.2(4) and 144.054.2. Likewise, the AHC did not err in finding CCE I was not required to establish its replacement equipment is "substantially used" in manufacturing in addition to proving the equipment satisfies the integrated plant doctrine and is "used directly" in manufacturing. Therefore, the AHC's decision finding CCE I is entitled to use

13

tax exemptions with respect to its 2011 and 2012 purchases of replacement equipment used to provide telecommunications service is affirmed.

_____
PATRICIA BRECKENRIDGE, JUDGE

Wilson, C.J., Powell, Fischer, Ransom
and Draper, JJ., and Clark II, Sp.J., concur.
Russell, J., not participating.

14